STATE OF NORTH CAROLINA v. ROBERT WILLIAM WALLS

No. 42A93

(Filed 3 November 1995)

## 1. Criminal Law § 240 (NCI4th)— first-degree murder—continuance denied—no error

While a motion to continue ordinarily is addressed to the discretion of the trial court, a motion which raises a constitutional issue is fully reviewable on appeal. However, regardless of whether the motion raises a constitutional issue, a denial is grounds for a new trial only when defendant shows that the denial was erroneous and prejudicial.

**Am Jur 2d, Continuance § 59.**

## 2. Criminal Law § 261 (NCI4th); Constitutional Law § 274 (NCI4th)— denial of continuance—effective assistance of counsel—no error

There was no error and no denial of effective assistance of counsel in a first-degree murder prosecution where the trial court denied defendant's motion for a continuance. Contrary to his argument, defendant was not denied access to witnesses, but was able with the aid of investigators to interview witnesses to prepare for trial, and he had adequate time to prepare his defense. Lead defense counsel was appointed on 1 June 1992, a continuance had been granted from the 7 December 1992 term to the 11 January 1993 term, defendant had at his disposal two

1

STATE v. WALLS

[342 N.C. 1 (1995)]

investigators with funds to hire a third investigator, and it is evident that defendant's counsel represented his interests vigorously. The reasons defendant advanced for a second continuance were less than substantial and it appears that defendant simply wanted yet more time to prepare.

**Am Jur 2d, Continuance §§ 63, 108; Criminal Law § 746.**

3. **Criminal Law § 107—first-degree murder—criminal records of State's witnesses—not subject to disclosure**

The criminal records of the State's witnesses in a first-degree murder prosecution were not subject to disclosure. It has previously been held that the trial court is without authority to grant such a request, that the failure to order disclosure of the criminal records of the State's witnesses is not violative of due process, and that N.C.G.S. § 15A-903 does not grant defendant the right to discover the names and addresses of State's witnesses, let alone the criminal records. Furthermore, the records in this case were not material.

**Am Jur 2d, Depositions and Discovery § 439.**

4. **Evidence and Witnesses § 1256 (NCI4th)— first-degree murder—right to counsel invoked—subsequent inculpatory statements—voluntary**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to suppress statements made to a detective where defendant contended that the statements were the result of a custodial interrogation after he had invoked his right to remain silent and could not be spontaneous. While defendant was in custody, he was not interrogated: the court found that the detective asked defendant nothing further after defendant signed a paper that he no longer wished to make a statement, the detective asked defendant what had happened to his hand after he complained that it hurt during fingerprinting, defendant replied that he had hit a tree, the detective asked why, and defendant said, "I should have hit her a little harder so I could really hurt my hand." The detective had no reason to believe that his questions about defendant's hand were reasonably likely to evoke an incriminating response; defendant's remarks were volunteered statements and the detective's questions did not convert the conversation into an interrogation under *Miranda*.

**Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence §§ 719 et seq.**

5. **Evidence and Witnesses § 1323 (NCI4th)— first-degree murder—inculpatory statement after right to silence invoked—no finding as to who reinitiated conversation**

There was no prejudicial error in a first-degree murder prosecution where defendant alleged that he was improperly questioned after invoking his right to counsel and the trial court concluded that the statement made by defendant was spontaneous but did not make a specific finding as to who reinitiated conversation. Assuming that it was error for defendant's statements to have been admitted without an exact finding as to who reinitiated conversation, any error was harmless in light of his other statements, eyewitness testimony, and other corroborating testimony.

**Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence §§ 719 et seq.**

6. **Evidence and Witnesses § 1301 (NCI4th)— first-degree murder—inculpatory statement—finding that defendant not under the influence of alcohol**

There was no error in a first-degree murder prosecution where the trial court concluded that defendant freely, knowingly, intelligently, and voluntarily waived his rights after finding that defendant was not under the influence of alcohol where a detective testified that defendant had told the detective that he was under the influence of beer but the detective stated that, although he could smell beer upon defendant and believed that defendant had been drinking, he was not of the opinion that defendant was under the influence. Furthermore, the detective testified that defendant remembered the first set of *Miranda* rights given him in the patrol car. The trial court's findings of fact were based upon competent evidence and therefore are binding on appeal and it cannot be said, viewed under the totality of the circumstances, that the trial court's conclusion of law was error.

**Am Jur 2d, Evidence §§ 710 et seq.**

**Sufficiency of showing that voluntariness of confession or admission was affected by alcohol or other drugs. 25 ALR4th 419.**

7. **Constitutional Law § 352 (NCI4th)— right to remain silent—testimony concerning—jury not in courtroom—no plain error**

There was no plain error in a first-degree murder prosecution where defendant contended that the court allowed the prosecu-

tor to elicit testimony concerning defendant's invocation of his right to remain silent, but the jury had been taken from the courtroom and heard no testimony concerning defendant's exercise of his right to remain silent.

**Am Jur 2d, Criminal Law §§ 701 et seq., 936 et seq.**

**8. Jury § 217 (NCI4th)— first-degree murder—jury selection—inability to impose capital punishment—excusal for cause**

The trial court did not err in a first-degree murder prosecution by excusing for cause four prospective jurors who allegedly gave equivocal answers to questions concerning the death penalty but three were ultimately unequivocal and the fourth said that she did not believe she could vote to impose the death penalty. It cannot be said that the trial court abused its discretion in determining that the views of the fourth would substantially impair the performance of her duties as a juror.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**9. Jury § 226 (NCI4th)— first-degree murder—jury selection—pretrial motion to conduct thorough voir dire denied—denial of rehabilitation**

There was no error in jury selection in a first-degree murder prosecution where defendant argued that the denial of his pretrial motion to conduct a "searching and thorough *voir dire*" of prospective jurors concerning mitigating circumstances and their ability to fairly determine punishment created an environment in which he was not permitted to rehabilitate four prospective jurors who were equivocal about the death penalty. There is absolutely no evidence in the record that, as a result of the denial of the motion, defendant faced any sort of hostile or discourteous environment from the trial court during *voir dire* which restrained him from rehabilitating any prospective juror.

**Am Jur 2d, Jury § 189.**

**10. Jury § 148 (NCI4th)— first-degree murder—jury selection—pretrial motion to ask certain questions—denied**

The trial court did not err in a first-degree murder prosecution by denying defendant's pretrial motion that he be allowed "to ask whether prospective jurors can consider as a mitigating circumstance" evidence in regard to defendant's turbulent family history and mental retardation, among others. These questions amounted to an impermissible attempt to stake out jurors and were improper. Defendant was freely permitted to ask prospective jurors whether they could follow the trial court's instructions concerning mitigating circumstances, whether they understood they could individually find mitigating circumstances to exist, and whether their support for the death penalty was so strong that they would find it difficult to follow the law and consider a sentence of life imprisonment.

**Am Jur 2d, Jury §§ 205 et seq.**

**11. Jury § 215 (NCI4th)— first-degree murder—jury selection—juror expressing belief in capital punishment—not excused for cause**

There was no error in jury selection in a first-degree murder prosecution where the trial court did not excuse for cause a juror who defendant contended could not fairly consider a life sentence. Defendant failed to object to the trial court's denial of his challenge for cause and did not seek to renew his challenge as to this juror; however, even assuming that defendant properly complied with N.C.G.S. § 15A-1214(h), he would not be entitled to relief because the prospective juror, after initially indicating he felt first-degree murderers should receive the death penalty, stated he could consider both possible sentences and would follow the law.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**12. Jury § 151 (NCI4th)— first-degree murder—jury selection—jury in favor of death penalty—questions not allowed**

There was no error in jury selection in a first-degree murder prosecution where defendant was not allowed to ask a prospec-

tive juror three questions which were all variations on the theme of whether the prospective juror's belief in the death penalty was so strong that he could not consider life imprisonment. Defendant was allowed to make this inquiry of the prospective juror.

**Am Jur 2d, Jury §§ 198, 199.**

**13. Jury § 257 (NCI4th)— first-degree murder—jury selection—peremptory challenges—not racially based**

There was no error in a first-degree murder prosecution where defendant contended that the State exercised its peremptory challenges in a racially discriminatory manner. Even if defendant had timely objected at trial, defendant failed to carry his burden of establishing a *prima facie* case of racial discrimination in the prosecutor's exercise of peremptory challenges. While the prosecutor used more peremptory challenges against blacks than whites, such numbers alone are insufficient to make a *prima facie* case of racial discrimination. The jury which ultimately heard defendant's case was composed of seven African-Americans and five whites.

**Am Jur 2d, Jury §§ 244, 262.**

**14. Jury § 257 (NCI4th)— first-degree murder—jury selection—consistent exclusion of African-Americans**

A first-degree murder defendant who contended that his prosecutor consistently excludes African-Americans from jury service failed to show that the prosecutor, as a matter of practice in this or any other case, exercised peremptory challenges on the basis of race alone. It was noted that, under *Batson v. Kentucky*, 476 U.S. 79, a defendant may demonstrate purposeful racial discrimination in the selection of a petit jury by relying only upon the facts regarding jury selection in that individual defendant's case.

**Am Jur 2d, Jury §§ 244, 262.**

**15. Jury § 141 (NCI4th)— first-degree murder—jury selection—questions concerning parole eligibility—not allowed**

There was no error in jury selection in a first-degree murder prosecution where the trial court denied defendant's motion to permit *voir dire* of prospective jurors concerning their attitudes on parole eligibility.

**Am Jur 2d, Jury §§ 205 et seq.**

**16. Jury § 116 (NCI4th)— first-degree murder—jury selection—failure to object to question—waiver of appeal**

A first-degree murder defendant who did not object at trial waived the right to assert on appeal error in the trial court allowing the prosecutor to ask a question which he contended impermissibly staked out prospective jurors.

**Am Jur 2d, Jury §§ 205 et seq.**

**17. Jury §§ 132, 142 (NCI4th)— first-degree murder—jury selection—questions regarding presence of defendant, absence of victim—no error**

There was no error in jury selection in a first-degree murder prosecution where defendant contended that the prosecutor should not have been permitted to question prospective jurors about whether they would feel sympathy toward defendant because they would be able to see him every day of the trial but would not be able to see the victim. Under *State v. Smith*, 328 N.C. 99, the questions were not designed to suggest to jurors that they should disregard any sympathy they felt for defendant, but to ascertain whether they would feel sympathy for defendant based solely on his presence in court. Additionally, the question was not an attempt to elicit in advance what the jurors' decision would be under a certain state of evidence.

**Am Jur 2d, Jury §§ 205 et seq.**

**18. Constitutional Law § 295 (NCI4th)— first-degree murder— effective assistance of counsel—representation of defendant and a State's witness**

A defendant in a first-degree murder prosecution failed to carry his burden of showing that an actual conflict of interest adversely affected his lawyers' performance where the prosecutor, outside the presence of the jury, informed the trial court that one of defendant's attorneys had previously represented a State's witness in district court, that the charge had been appealed and was pending in superior court and that the witness thought defense counsel still represented him; the defense attorney stated that he believed that he had made a limited appearance, had had no contact with the witness since the district court appearance, would not preclude himself from representing the witness, felt no ethical conflict because the cases were not related, and that defendant's other counsel would conduct the cross-examination;

defendant received a vigorous and spirited defense, including a detailed and thorough cross-examination of this witness; and the nature and status of the charge against the witness was explored at the beginning of his direct examination, leaving no ground for the defense to cover on this point. Under *Cuyler v. Sullivan*, 446 U.S. 335, in order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. On this record, there are no special circumstances requiring the trial court to conduct any more extensive inquiry than the one it did conduct; however, even assuming that defense counsel did actively represent conflicting interests, defendant has not shown that the alleged dual representation actually affected the adequacy of his representation.

**Am Jur 2d, Criminal Law §§ 754 et seq.**

**19. Criminal Law § 372 (NCI4th)— first-degree murder—cross-examination—objection sustained—not a comment upon the evidence**

There was no error in a first-degree murder prosecution where defendant contended that the trial court violated its duty not to comment upon the evidence by sustaining a State's objection. The argument that the court forced the jury to accept the State's theory of the case by simply sustaining an objection is wholly without merit; a trial court's ruling on an objection falls far short of impermissible conduct or improper comment upon the evidence. The trial court's singular act of sustaining an objection did not, in any perceptible or even minute way, amount to an improper comment upon the evidence.

**Am Jur 2d, Trial §§ 395 et seq.**

**20. Evidence and Witnesses § 2874 (NCI4th)— first-degree murder—cross-examination—discretion of court**

The trial court did not abuse its discretion in sustaining objections to two questions on cross-examination in a first-degree murder prosecution where defendant contended that the trial court's sustaining of these objections prevented defendant from adequately confronting the most important witness against him. An answer to the first excluded question would have been merely cumulative and, with regard to the second, defense coun-

sel sought to testify himself. He was allowed to continue his cross-examination once the question was properly phrased.

**Am Jur 2d, Witnesses §§ 717 et seq.**

## 21. Evidence and Witnesses § 298 (NCI4th)— first-degree murder—cross-examination—impeachment of another witness

The trial court did not err in a first-degree murder prosecution by sustaining the prosecutor's objections to defendant's attempt to elicit information from a prosecution witness for the purpose of impeaching another prosecution witness. The impeachment questions propounded by defendant, as clearly extrinsic evidence, would be proper only if the first witness had testified in some fashion as to the second's character for truthfulness or untruthfulness and there is no instance in the record in which the first witness testified in any way concerning the second's character. N.C.G.S. § 8C-1, Rule 608(b).

**Am Jur 2d, Witnesses §§ 320, 321.**

## 22. Kidnapping and Felonious Restraint §§ 17, 21 (NCI4th)— first-degree murder and kidnapping—mother and child— evidence sufficient

The trial court did not err in a first-degree murder prosecution by submitting the underlying felony of kidnapping to the jury where the evidence tends to show that, during a ride to Richmond, defendant began to hit his companion, Alice, in the face so severely that her glasses fell out of the car window; she pulled the car over to get the glasses from the highway, and as she walked back to the car, she heard her three year old son Christopher scream; defendant hit, cursed and threatened to kill Christopher every time the child tried to get his drink out of the cooler; defendant threw a beer can at the child; Alice heard Christopher grunt when it hit him; once in Richmond, defendant kicked Alice in the face and took the car keys so she could not escape; defendant then made her drive to a house where he claimed he had friends who would kill her and the child; defendant continued his physical and verbal assaults against Alice on the return trip from Richmond while the baby screamed and cried; finally, when Alice could no longer see to drive, she pulled up to a welcome center and defendant took over the driving; and to keep Alice conscious, defendant continually struck her in the chest. Defendant's claim that Alice consented to being in the car

with defendant because she did not take her three-year-old child and run away on foot in Richmond is totally without merit, as is his contention that an almost unconscious Alice consented to being in the car with defendant because she did not ask for help when they stopped at the welcome center.

**Am Jur 2d, Jury § 31.**

### 23. Homicide § 393 (NCI4th)— first-degree murder—intoxication—instruction denied—evidence insufficient

The trial court did not err in a first-degree murder prosecution by denying defendant's request for an instruction on voluntary intoxication where, although defendant contends that the testimony at trial demonstrated that he was drinking the day before the murder, the day of the murder and the day after the murder, that his cursing the victims is evidence of his intoxication, and that he told a witness that he could not move his car because he was drunk, the evidence shows defendant is an alcoholic and his alcohol tolerance would be much higher than one who does not drink every day; defendant ignores evidence showing that he was quick-witted enough to invent a lie when he told a witness about an old dog, rather than a baby, being in the river; defendant successfully drove a car from a welcome center to the river and then to his brother's house; and defendant makes no claim he cannot remember his actions the day of the murder. Defendant failed to carry his burden to produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

**Am Jur 2d, Homicide § 447.**

### 24. Homicide § 553 (NCI4th)— first-degree murder—second-degree not submitted—no error

A defendant in a first-degree murder prosecution was not entitled to an instruction on second-degree murder where each element of first-degree murder, including premeditation and deliberation, was positively supported by the evidence and, because evidence of defendant's intoxication was insufficient to support an instruction on voluntary intoxication, there was no evidence to negate the elements of first-degree murder other than defendant's denial that he committed the crime.

**Am Jur 2d, Homicide §§ 45, 425 et seq.**

**25. Criminal Law §§ 427, 432 (NCI4th)— first-degree murder— prosecutor's argument—defendant's silence—appeal to jurors' sympathies**

The trial court did not err in a first-degree murder prosecution by not intervening *ex mero motu* to censure the State's closing argument where defendant contends that on two occasions the prosecutor impermissibly alluded to defendant's election not to testify on his own behalf. The first statement was simply one part of the prosecutor's anticipatory rebuttal of various issues, either legal or factual, that might be raised by the defendant during his closing argument and the second states a fact in evidence. Moreover, a portion of the argument which defendant contends improperly appealed to the sympathy of the jury was firmly rooted in the evidence and was proper.

**Am Jur 2d, Trial §§ 291 et seq.**

**26. Criminal Law § 1309 (NCI4th)— first-degree murder—capital sentencing—introduction of evidence**

Under *Lockett v. Ohio*, 438 U.S. 586, while the jury in a capital case must not be precluded from considering as a mitigating factor any aspect of defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death, under *State v. Pinch*, 306 N.C. 1, the ultimate issue concerning the admissibility of such evidence must still be decided by the presiding trial judge, and his decision is guided by the usual rules which exclude repetitive or unreliable evidence or that lacking an adequate foundation. *Lockett* notes that nothing in that opinion limits the traditional authority of a court to exclude as irrelevant evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.

**Am Jur 2d, Trial §§ 595-600.**

**27. Criminal Law § 1311 (NCI4th)— first-degree murder—capital sentencing—residual doubt—not admissible as mitigating evidence**

Proposed evidence that a three-year-old murder victim fell into a river, rather than being thrown by defendant, was not admissible as mitigating evidence in the sentencing phase where a witness came forward after the guilty verdict but before the sentencing phase began; defendant proffered the testimony during

the sentencing phase; and the testimony was that the victim's mother, whom defendant also tried to drown, had said that the child had fallen into the river. The only relevance of the proposed evidence is whether defendant was guilty of the murder of the child, but such a question is reserved for the guilt-innocence phase, and no motion was made for a mistrial. Residual doubt testimony is not admissible during the sentencing proceeding of a capital case.

**Am Jur 2d, Trial §§ 595-600.**

**28. Criminal Law § 1311 (NCI4th)— first-degree murder—capital sentencing—evidence that death accidental—not admissible to impeach aggravating circumstances**

Evidence from a witness who came forward after the guilt-innocence phase of a first-degree murder prosecution that the three-year-old victim was not thrown by defendant but fell into a river was not admissible in the capital sentencing phase for the purpose of impeaching the aggravating circumstances. Even assuming that the testimony was credible, and bearing in mind the evidentiary flexibility encouraged in capital cases, the proposed testimony does not impeach the testimony of the victim's mother with regard to any of the three aggravating circumstances submitted to and found by the jury. The question of whether the victim "fell" into the river has relevance only to whether a murder was committed in the first place, not as to how it was committed.

**Am Jur 2d, Trial §§ 595-600.**

**29. Criminal Law § 1311 (NCI4th)— first-degree murder—capital sentencing—evidence that defendant was not guilty— not admissible**

Evidence in a capital sentencing proceeding that defendant was not guilty was not admissible under *Green v. Georgia*, 442 U.S. 95, which held that the hearsay testimony of a State's witness in a prior, separate trial of a codefendant regarding defendant's private confession was relevant at the sentencing phase and that its exclusion violated Due Process. The State in this case never relied upon the testimony and this case is fundamentally different factually from *Green*.

**Am Jur 2d, Trial §§ 595-600.**

**30. Criminal Law § 1355 (NCI4th)— first-degree murder—mitigating circumstances—lack of prior criminal activity—no error in submitting**

The trial court did not err in the sentencing phase of a first-degree murder prosecution by submitting the statutory mitigating circumstance of no significant history of prior criminal activity where defendant had convictions for driving while impaired, assault, communicating threats, escape, nonfelonious breaking and entering, receiving stolen goods, possessing a stolen vehicle, and possessing stolen credit cards. What is of import in determining whether a rational juror could reasonably find this mitigating circumstance to exist is the nature and age of the prior criminal activities rather than the mere number, and the submission of this circumstance has been upheld based upon criminal activities equal to or greater than the defendant's in this particular case.

**Am Jur 2d, Trial §§ 595-600.**

**31. Criminal Law § 1355 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—no prior criminal activity—no error in submitting**

There was no error in a first-degree murder sentencing hearing in the submission of the mitigating circumstance of no significant previous criminal activity over defendant's objection where defendant elected to present through his psychiatrist evidence concerning defendant's previous criminal activities and a rational juror could find that those activities were not significant. The trial court had no discretion in submitting the circumstance. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Trial §§ 595-600.**

**32. Constitutional Law § 315 (NCI4th)— first-degree murder—capital sentencing—concession that mitigating circumstance did not exist—not a denial of effective assistance of counsel**

A first-degree murder defendant was not denied effective assistance of counsel during a capital sentencing hearing when his counsel argued to the jury that he was not going to contend that they find the mitigating circumstance of no significant history of criminal activity where defense counsel had objected to the submission of the circumstance but defendant first placed the

evidence before the jury. This was not tantamount to admitting defendant's guilt before a jury against defendant's wishes and did not violate defendant's Sixth Amendment right to effective assistance of counsel. Further, it does not follow that because no juror found any of the submitted mitigating circumstances to exist the jurors used the no significant previous criminal activity mitigator as a *de facto* aggravator.

**Am Jur 2d, Criminal Law §§ 598-600, 752.**

**33. Criminal Law § 1349 (NCI4th)— first-degree murder—capital sentencing—mitigating circumstances not submitted or combined—no error**

There was no error in a first-degree murder capital sentencing hearing where defendant contended that the Eighth and Fourteenth Amendment requirements that the trial court submit for the jury's consideration any circumstance requested by defendant which is supported by the evidence and is capable of being understood as mitigating by a reasonable juror was violated by the trial court either refusing to submit or combining the mitigating circumstances defendant requested. It is not error for the trial court to refuse to submit a mitigating circumstance proffered by defendant when that circumstance is subsumed into another mitigating circumstance which is submitted to the jury. No credible evidence supported the proposed circumstance that defendant had been abused physically and emotionally as a child.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**34. Criminal Law § 442 (NCI4th)— first-degree murder—sentencing prosecutor's argument—not biblically based**

There was no error in a first-degree murder capital sentencing hearing where defendant contended that the State's closing arguments urged the jury to find defendant guilty based on fear and unreasoned prejudice rather than upon the evidence presented. Although defendant contended that the bulk of the closing argument was a sermon telling the jury that the capital punishment statute was a statute of punishment enacted by a government ordained by God, the prosecutor's argument clearly informed the jury that it was to make its sentencing decision based upon N.C.G.S. § 15A-2000, not the Bible.

**Am Jur 2d, Trial §§ 554, 567 et seq.**

**35. Criminal Law § 446 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—community pressure**

Although a defendant in a first-degree murder sentencing hearing interprets a portion of the prosecutor's argument as informing the jury that it should respond to community pressure and impose the death penalty, the arguments were proper and merely informed the jury that its verdict would send a message to the people of the county that this murder was deserving of the death penalty, the highest penalty available.

**Am Jur 2d, Trial §§ 567-569.**

**36. Criminal Law § 448 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—characteristics of victim**

A defendant in a first-degree murder sentencing hearing did not object at trial to the prosecutor's argument that the jury should return a sentence of death because of the characteristics of the victim and the feelings of his family and the argument does not rise to the level of gross impropriety requiring that the court act *ex mero motu.*

**Am Jur 2d, Trial §§ 664 et seq.**

**37. Criminal Law § 454 (NCI4th)— first-degree murder—prosecutor's argument—four minute silence—time required for victim to die**

The portion of a first-degree murder sentencing hearing closing argument during which the prosecutor remained silent for four minutes to illustrate the time the victim lay on the river bottom was proper.

**Am Jur 2d, Trial § 554.**

**38. Criminal Law § 441 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—defense psychiatrist paid**

A reference in the prosecutor's closing argument in a first-degree murder sentencing hearing to defendant's expert witness as a "paid psychiatrist" was not objected to at trial and did not translate into an argument that the witness would testify to anything for money, but simply stated the fact that the witness was paid.

**Am Jur 2d, Trial § 695.**

**39. Criminal Law § 432 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—characterizations of defendant**

References in a prosecutor's closing argument in a first degree murder sentencing hearing to defendant as "Jason," "Freddie Kruger," and "that devil" were not improper.

**Am Jur 2d, Trial § 566.**

**40. Criminal Law § 468 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument**

The prosecutor in a first-degree murder sentencing hearing did not improperly suggest to the jury in his closing argument that defendant was not entitled to constitutional protections when the prosecutor noted that the victim and his mother (who was assaulted) had no lawyer, no jury, no bailiff, no judge, and no legal rights. The prosecutor merely argued that defendant, as judge, jury, and executioner, single-handedly sealed the victim's fate. Moreover, the prosecutor did not attack defendant's right to counsel when he mentioned that defendant conferred with his attorneys and his psychiatrist before relating his version of events on the day of the murder, but merely argued from the psychiatrist's report that defendant was reluctant to talk about the murder until he was reassured by his counsel and psychiatrist and asked rhetorically why defendant was nervous.

**Am Jur 2d, Trial §§ 664-666.**

**41. Criminal Law § 456 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—personal responsibility**

The jury in a first-degree murder sentencing hearing could not have understood the prosecutor's argument that "we're the masters of our destiny and we are responsible for the consequences of our actions" to relieve the jury of the responsibility to recommend a sentence, especially when the argument contained no reference to the defendant's right to appeal the jury's sentencing recommendation.

**Am Jur 2d, Trial §§ 572, 574.**

**Prejudicial effect of statement of court that if jury makes mistake in convicting it can be corrected by other authorities. 5 ALR3d 974.**

**Prejudicial effect of statement by prosecutor that verdict, recommendation of punishment, or other finding by**

jury is subject to review or correction by other authorities. 10 ALR5th 700.

**42. Evidence and Witnesses § 2750.1 (NCI4th)— first-degree murder—sentencing hearing—cross-examination—door opened on direct**

There was no prejudicial error in a first-degree murder prosecution where defendant contended that the prosecutor elicited improper character evidence regarding defendant through defendant's brother, but the door had been opened on direct examination through questions regarding specific instances of misconduct toward defendant's wives. Although the court sustained defendant's objections to many of the questions and the prosecutor persisted in some lines of improper questioning, it cannot be said that there is a reasonable possibility that the outcome of the trial would have been different had the questions not been propounded.

**Am Jur 2d, Witnesses §§ 717, 718.**

**43. Criminal Law § 1316 (NCI4th)— first-degree murder—sentencing hearing—cross-examination of defense expert— defendant's criminal activity and drug abuse**

There was no abuse of discretion in a first-degree murder prosecution where defendant contended that there was prosecutorial misconduct in the cross-examination of his psychiatrist. The prosecutor was placed in the position of having to rebut the existence of the no significant history of criminal activity mitigator and the cross-examination questions were relevant.

**Am Jur 2d, Expert and Opinion Evidence §§ 88, 89.**

**44. Criminal Law § 1329 (NCI4th)— first-degree murder—sentencing—issues three and four—yes or no answers**

The trial court did not err in a first-degree murder sentencing hearing by refusing to allow defendant to argue that the unanimity requirement extends only to a recommendation of death and not life. Defendant is incorrect in arguing that when the State fails to convince all twelve jurors that the answers to Issues Three and Four are "yes," then the jury must automatically answer those issues "no." The unanimity requirement extends to both "yes" and "no" answers to Issues Three and Four. Should the jurors be unable to reach the required unanimity through deliberations after a reasonable time, jurors must so report to the presiding

trial judge, who will impose a mandatory sentence of life. It remains the law that the jury is not to be informed that its failure to reach a sentencing recommendation results in mandatory imposition of life imprisonment.

**Am Jur 2d, Trial § 572.**

**45. Criminal Law § 1323 (NCI4th)— first-degree murder— sentencing—instructions—nonstatutory mitigating circumstances**

The trial court instruction in a first-degree murder sentencing hearing with respect to nonstatutory mitigating circumstances did not offend the Eighth and Fourteenth Amendments by allowing the jury to refuse to consider mitigating evidence.

**Am Jur 2d, Trial § 1165.**

**46. Criminal Law § 1363 (NCI4th)— first-degree murder—sentencing—instructions—value of mitigating circumstances**

The trial court did not err in a first-degree murder capital sentencing hearing by not intervening *ex mero motu* to prevent the prosecutor from arguing that the jurors could consider a particular mitigator, both statutory and nonstatutory, if the evidence supported it and the jurors deemed it to have mitigating value. The prosecutor here was referring only to nonstatutory mitigating circumstances and not to all mitigating circumstances and the argument was proper as to nonstatutory mitigating circumstances.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**47. Criminal Law § 1347 (NCI4th)— first-degree murder—capital sentencing—aggravating circumstance—course of conduct—evidence sufficient**

The evidence was sufficient in a first-degree murder capital sentencing hearing to warrant the submission of the course of conduct aggravating circumstance to the jury where the evidence showed that defendant undertook a violent course of conduct over a narrow period of two days in which he physically battered the three-year-old victim's mother, threatened to kill her and ultimately tried to drown her on the very day he succeeded in drowning the victim, and, as he held the mother's head under water, he asked if she could see the child and told her that she would join him.

**Am Jur 2d, Criminal Law §§ 598, 599.**

STATE v. WALLS

[342 N.C. 1 (1995)]

**48. Criminal Law § 1343 (NCI4th)— first-degree murder—capital sentencing—especially heinous atrocious or cruel aggravating circumstance—instructions not unconstitutionally vague**

The trial court's instructions on the especially heinous, atrocious, or cruel aggravating circumstance in a first-degree murder capital sentencing hearing were not unconstitutionally vague.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**49. Criminal Law § 1373 (NCI4th)— first-degree murder—death sentence—not disproportionate**

A sentence of death was not disproportionate in a first-degree murder prosecution where the aggravating circumstances found by the jury were supported by the evidence and the jury did not sentence defendant while under the influence of passion, prejudice, or any other arbitrary factor. This case involves the murder of a young child; the aggravating circumstances found by the jury included the especially heinous, atrocious, or cruel and the course of conduct aggravating circumstances; defendant was found guilty of first-degree murder based upon the theories of premeditation and deliberation and the felony murder rule; the jury found each of the three aggravating circumstances to exist; and, although the court submitted four statutory mitigating circumstances, five nonstatutory mitigating circumstances and the catchall circumstance, no juror found any of these mitigating circumstances to exist. The victim was vulnerable; his injuries were painful and he endured a period of panic; and he remained conscious and aware for several minutes before his death. Based upon the characteristics of this defendant and the crime he committed, the sentence of death was neither excessive nor disproportionate.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

Justice WHICHARD concurring in the result in part.

Justice FRYE joins in this concurring opinion.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Brown (Frank R.), J., at the 11 January 1993 Criminal Session of Superior Court, Northampton County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his assault with a deadly weapon with intent to kill inflicting serious injury conviction was allowed by this Court on 6 July 1994. Heard in the Supreme Court 13 March 1995.

*Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*North Carolina Resource Center, Office of the Appellate Defender, by Henderson Hill, Director, and Gretchen Engel, Staff Attorney, for defendant-appellant.*

LAKE, Justice.

Defendant was indicted on 20 July 1992 for the offenses of assault with a deadly weapon with intent to kill inflicting serious injury and the first-degree murder of three-year-old James Christopher Bainbridge. Defendant was tried capitally, and the jury returned verdicts of guilty of assault with a deadly weapon with intent to kill inflicting serious injury and guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of death. Judge Brown sentenced defendant to death for the murder conviction and a consecutive term of twenty years' imprisonment for the assault conviction. For the reasons stated herein, we find no prejudicial error in the guilt/innocence and sentencing phases, and we conclude the sentence of death is not disproportionate.

Alice Bainbridge, who was separated from her husband, lived with their three-year-old son, Christopher Bainbridge, and the defendant in Roanoke Rapids. On 23 May 1992, Alice, Christopher and defendant left for Richmond, Virginia, sometime around 10:00 a.m. to visit defendant's son. Alice drove, and Christopher was buckled in his car seat in the back. During the drive, defendant began hitting Alice in the face, knocking her glasses off, and calling her foul names. The second time Alice's glasses were knocked off, they fell out of the car window and landed on the highway. Alice was forced to pull over and retrieve them. After picking the glasses up from the road, Alice returned to the car and heard Christopher scream. The physical

assault against Alice continued. Alice had put a drink for the child in a cooler, and every time Christopher tried to get the drink out of the cooler, defendant would hit and curse him. Defendant also threw an almost full beer can at Christopher and threatened to kill him. Once they reached defendant's son's house in Richmond, defendant kicked Alice in the face and took the car keys out of the ignition. He then went inside, leaving Alice and the child stranded in the car. When defendant's son's wife came outside the house and saw Alice's bloody nose and swollen lip, she threatened to call the police. Defendant made Alice drive to another house, where defendant said he had friends who would kill Alice and Christopher. No one was home. On the way back to Roanoke Rapids, defendant continued to strike Alice. Her glasses flew out of the window again, but this time defendant would not let her stop to get them. Alice drove to a welcome center, and defendant got behind the wheel because Alice could not see to drive anymore. Feeling weak, Alice slumped down in the passenger seat; defendant continually struck her on the chest to keep her awake. Alice testified the next thing she remembered was defendant parking the car at a boat landing by the Roanoke River. Defendant opened the back door of the car and got Christopher out of his car seat. Christopher let out one cry and one grunt. Defendant, holding Christopher by one hand and one foot, threw the child into the river. Alice ran to the water begging for defendant to help her. Defendant refused.

Melvin McMichael and Shirley Floyd were fishing at a spot not far from the boat ramp. They heard a splash and a cry for help. McMichael ran to investigate and saw Alice feeling around under the water. Her face was swollen, and she was bleeding from the nose and mouth. She asked McMichael to help her find her baby, but defendant told McMichael that only an old dog fell in the river and that he had his baby. Defendant then reached into the car and pulled out a puppy and began to pet it. Defendant refused McMichael's request that he move his car so McMichael could go get help. Only when McMichael drew his gun did defendant comply. McMichael and Floyd drove away and called the police. On their way back, they saw defendant quickly driving away from the boat landing, and it did not look as though Alice was in the car with him. McMichael, Floyd and Police Chief Eugene Norwood found Alice floating face-down in the river. About ten minutes after the rescue squad arrived, Christopher was discovered on the river bottom.

Alice and Christopher were transported to different hospitals. One nurse testified that Alice's face was so swollen it looked as though she had one head with a smaller head on either side of her face. She was so bruised that it was impossible to tell what race she was. Alice could not talk because she was intubated, so she mouthed to investigators that it was defendant who had attacked her and Christopher. Medical personnel pumped foul-smelling, brown water out of her lungs for several days. Alice remained in the hospital until 28 May 1992.

When Christopher arrived at the hospital, he was unresponsive and comatose. The upper part of his abdomen was red. This area increased in discoloration and swelling during the hours Christopher survived. Dr. Dale Newton testified he believed Christopher had been struck with a hard object on the upper part of his abdomen. Christopher was also hypothermic and showed signs of edema, or swelling of the brain. Christopher's condition worsened, and he was eventually declared clinically brain dead. He was maintained only on life support. Alice gave permission to discontinue life support, and the child died. In the opinion of Dr. Newton, Christopher's brain death was caused by lack of oxygen to the brain which, in turn, was caused by near-drowning.

Further evidence for the State came from Karen Tucker and Suzanne White, who testified that on 22 May 1992, the day before the murder, they, along with Alice, Christopher and defendant went to look at a trailer for rent in Gaston. Defendant had a cooler full of beer in the trunk. During the trip, defendant cursed at Alice and Christopher. On the way back from Gaston, defendant asked Alice to make a turn, and when Alice refused, he hit her on the head and jerked the steering wheel, turning the car down a road that led to a boat landing at the river. Defendant then grabbed Christopher under the arms and swung him out over the water, as the child cried. Alice noticed two fishermen in a boat watching them. One of the men said something, and defendant put Christopher down and remarked that he would do what he wanted to do later. It was at this same boat landing, the very next day, that defendant threw Christopher into the river and also tried to drown Alice.

Defendant presented no evidence during the guilt/innocence phase. During the sentencing phase, defendant presented evidence through Dr. Robert Brown, a psychiatrist, who testified that defendant had, at different times in his life, carried various diagnoses includ-

**STATE v. WALLS**

[342 N.C. 1 (1995)]

ing depression with psychosis; schizoaffective disorder; general high anxiety disorder; mixed personality disorder, some of which included antisocial features; and severe substance abuse of alcohol, cocaine and heroin. Additional facts will be discussed at later points in this opinion where pertinent.

The jury found all three aggravating circumstances submitted: (1) that this murder was committed while defendant was engaged in the commission of a kidnapping; (2) that this murder was especially heinous, atrocious, or cruel; and (3) that this murder was part of a course of conduct including the commission of other crimes of violence against other persons. The trial court submitted four statutory mitigating circumstances, five nonstatutory mitigating circumstances and the catchall circumstance. No juror found any of these mitigating circumstances to exist. The jury recommended a sentence of death, and the trial court sentenced defendant accordingly.

PRETRIAL ISSUES

Defendant begins by arguing that the trial court violated defendant's rights to effective assistance of counsel and to present a defense by denying defendant's motion for a continuance.

Just prior to the beginning of jury selection, defendant moved for a continuance. In support of his motion, defendant made numerous arguments, including that he was still in the process of obtaining certain mental health documents regarding Alice Bainbridge and that he had not been provided with allegedly exculpatory statements made by defendant to officers at the time of his arrest. Defendant argued that he was entitled to "open file" discovery from the State, and that the State was in possession of certain articles of clothing and other objects which the defendant alleged he had not been allowed to review. Defendant further argued that the State had not revealed certain investigation results concerning a hit-and-run incident apparently involving defendant, which occurred just prior to the murder. Defendant also argued that he was entitled to receive, thirty days before trial, a list of State's witnesses, and additionally, that the State must disclose the criminal histories of all its witnesses. Defendant pointed out that both attorneys for the defendant had recently completed another capital case, and that the instant case was only the second capital trial for the lead defense counsel.

In response, the State contended that defendant had previously been granted one continuance in order that pertinent documents

might be received and reviewed. The prosecutor represented to the trial court that he was only aware of one statement made by defendant, a copy of which was in defendant's possession. The State also pointed out that defense counsel had made, and kept, an appointment to review the physical evidence at the Sheriff's Department. Photographs were shown and explained to defense counsel during this meeting. Defense counsel were informed that if they wished to have any blood testing performed on the clothing, they should notify the State, but the prosecutor had heard nothing further. Regarding the hit-and-run incident, the prosecutor had given defendant the telephone number and name of the highway patrolman who investigated the incident, as well as the telephone number, name and a brief synopsis of the expected testimony of an eyewitness to the incident. The State informed the trial court that defendant had two investigators working on his case and had been given between $2,000 and $3,000 to fund an additional third investigator. The prosecutor also told the trial court that two of the investigators working on behalf of defendant had interviewed many witnesses, including Alice Bainbridge. However, during a lengthy interview with Alice, the defense investigators allegedly misrepresented themselves to Alice as working for the district attorney's office. After the interview, the investigators handed Alice their cards, and she discovered they actually worked for the defense. Defense investigators also tried to interview Karen Tucker, but Tucker refused.

Defendant now argues that because the State brought the alleged fraudulent conduct of defense investigators, in misrepresenting their identities to the State's witness, to the attention of the trial court and questioned Alice and Karen Tucker in their direct examinations during trial about the allegations, this "had the effect of rendering a substantial set of witnesses unavailable to defense counsel during the pretrial investigations." This apparently demonstrates, according to the defendant, that the trial court's denial of the motion to continue was error.

[1] Ordinarily, a motion to continue is addressed to the discretion of the trial court, and absent a gross abuse of that discretion, the trial court's ruling is not subject to review. *State v. Searles*, 304 N.C. 149, 282 S.E.2d 430 (1981). When a motion to continue raises a constitutional issue, the trial court's ruling is fully reviewable upon appeal. *Id.* Regardless of whether the motion raises a constitutional issue or not, a denial of a motion to continue is only grounds for a new trial when defendant shows both that the denial was erroneous, and that he suf-

fered prejudice as a result of the error. *State v. Branch*, 306 N.C. 101, 291 S.E.2d 263 (1982).

> It is implicit in the constitutional [guarantee] of assistance of counsel . . . that an accused and his counsel shall have a reasonable time to investigate, prepare and present his defense. However, no set length of time is guaranteed and whether defendant is denied due process must be determined under the circumstances of each case.

*State v. McFadden*, 292 N.C. 609, 616, 234 S.E.2d 742, 747 (1977).

[2] At the outset, we simply cannot perceive how arguments to the trial court and questions posed at trial by the State during the direct examination of Alice concerning the allegations that investigators for the defense fraudulently identified themselves as working for the district attorney's office relate in any fashion to the propriety of the trial court's denial of the motion to continue. Contrary to defendant's argument, defendant was not denied access to witnesses. He was quite able, with the aid of several investigators, to interview witnesses to prepare for trial.

We conclude that defendant had adequate time to prepare his defense, and that his right to effective assistance of counsel was not violated. The record reveals that lead defense counsel was appointed to represent defendant on 26 May 1992, and co-counsel was appointed on 1 June 1992. Defendant had already been granted one continuance from the 7 December 1992 superior court term until the 11 January 1993 superior court term. Defendant had at his disposal two investigators and was granted additional funds to hire a third investigator. From the record, it is evident that defendant's counsel represented his interests vigorously. Further, the reasons defendant advanced for a second continuance were less than substantial. It appears that defendant simply wanted yet more time to prepare, and we find the trial court did not err in denying the motion to continue. This assignment of error is overruled.

[3] In his next assignment of error, defendant argues that the criminal history of the State's witnesses is exculpatory information and must be disclosed to him pursuant to *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963) and *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481 (1985). The trial court denied defendant's motion seeking disclosure of the criminal records of the State's witnesses, and defendant, without even alleging that witnesses for the State actually

have criminal records, now contends his rights to due process and to confront adverse witnesses were violated by the trial court's ruling.

We have previously held that "[t]he trial court is without authority to grant such a request and the failure of the court to order the disclosure of the State's witnesses' criminal records is not violative of due process." *State v. Alston*, 307 N.C. 321, 338, 298 S.E.2d 631, 643 (1983). We have also held that N.C.G.S. § 15A-903, which governs disclosure of evidence by the State, "does not grant the defendant the right to discover the names and addresses, let alone the criminal records, of the [S]tate's witnesses." *State v. Robinson*, 310 N.C. 530, 536, 313 S.E.2d 571, 575 (1984). Furthermore, we conclude that the criminal records of the State's witnesses are not material, as there is no reasonable probability that the result of the instant case would have been different had the State disclosed any criminal records of its witnesses, which may have existed, to the defendant. *See Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494. Because the criminal records of the State's witnesses are not material, the State was under no duty, pursuant to *Brady*, to disclose them. The trial court correctly denied defendant's motion, and this assignment of error is overruled.

Defendant contends in his next assignment of error that the trial court erred by denying defendant's motion to suppress certain statements made by him to Detective Allen Roye. Prior to jury selection, the trial court held a *voir dire* hearing on the motion. The State presented evidence through Detective Roye that on 24 May 1992, he drove to Alice Bainbridge's apartment to see defendant. When Detective Roye arrived, he found defendant, seated on a couch, handcuffed. Two officers from the Roanoke Rapids Police Department were present in the apartment. Detective Roye informed defendant that the police were investigating a serious assault, and defendant was a suspect. After escorting defendant to the patrol car, Detective Roye orally advised defendant of his *Miranda* rights. When asked if he understood each of his rights, defendant replied he did. Defendant also stated he would answer questions without a lawyer present. On the way to the Sheriff's Department in Roanoke Rapids, defendant talked about how much he enjoyed drinking. Detective Roye testified defendant wanted him to stop and get defendant a beer. Detective Roye refused. Once at the Sheriff's Department, Detective Roye took defendant to the fingerprinting room where defendant asked for, and was given, a cigarette. Detective Roye asked defendant if he remembered his rights; defendant said he did. Nevertheless, Detective Roye read defendant's *Miranda* rights again and provided him with a writ-

ten copy. Defendant once more indicated he understood his rights and executed a waiver of rights form. Detective Roye asked defendant if he was under the influence of alcoholic beverages or drugs, to which defendant responded, "Beer." Detective Roye testified that even though he believed defendant had been drinking, it was his opinion that defendant was not under the influence of alcohol.

After being told that the police were investigating the assaults of Alice and Christopher Bainbridge (Christopher was still alive at that point), defendant denied any knowledge about the assaults and signed a writing to the effect that he no longer wished to make a statement. Detective Roye began to fingerprint defendant, and when the detective took defendant's right hand, defendant exclaimed, "Ouch, take it easy." The detective noticed defendant's hand was badly swollen and cut, so Detective Roye asked, "What happened to your hand?" Defendant answered, "I hit an oak tree." The detective asked, "[What] did you hit a tree for? A tree has never hurt anybody." Defendant replied, "I should have hit her a little harder so I could really hurt my hand." Nothing further was said between the two.

Warrants were obtained for the assaults against Alice and Christopher. Detective Roye testified that when defendant was served with the warrant for assault on Alice Bainbridge, defendant stated, "This is for an assault on an oak tree." A short while later, Detective Roye learned that Christopher had died, and a warrant for first-degree murder was obtained. When this warrant was served on defendant, he said, "Well, that is good enough," and laughed.

Defendant elected to present no evidence during the *voir dire*. The trial court made. findings of fact in accord with the evidence adduced at the hearing. The trial court then made the following conclusions of law: that no constitutional rights of defendant were violated; that the statements made by defendant were spontaneous and not pursuant to any kind of interrogation; that the statements were made freely, voluntarily and understandingly; and that defendant was in full understanding of his rights to remain silent and to counsel. Accordingly, the trial court overruled defendant's objection to the admission of the statements and denied defendant's motion to suppress.

Defendant's contentions under this assignment of error are threefold. First, he argues that the trial court erred when it concluded that defendant's statements on 24 May 1992 were spontaneous and not pursuant to an interrogation. Second, defendant asserts that the fail-

ure of the trial court to make a specific determination as to who reinitiated conversation after defendant indicated he no longer wished to make a statement is a fatal defect. Third, defendant argues that under the totality of the circumstances, the trial court erred in finding that, although defendant had been drinking, he was not under the influence of alcohol.

*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, *reh'g denied*, 385 U.S. 890, 17 L. Ed. 2d 121 (1966), provides that custodial interrogation must cease when a suspect indicates he wishes to remain silent. "At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474, 16 L. Ed. 2d at 723. The Court, however, made quite clear that the holding in *Miranda* did not affect the fact that "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Id.* at 478, 16 L. Ed. 2d at 726. The Court has defined "interrogation" as "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308 (1980).

"The trial court's findings of fact following a *voir dire* hearing are binding on this [C]ourt when supported by competent evidence." *State v. Lane*, 334 N.C. 148, 154, 431 S.E.2d 7, 10 (1993). However, the trial court's conclusions of law based upon its findings are fully reviewable on appeal. *Id.* We conclude in this instance that the trial court's findings of fact are supported by the evidence, and that the conclusions of law drawn therefrom are not erroneous.

[4] Defendant contends that his statements to Detective Roye on 24 May 1992 were the result of a custodial interrogation after he had invoked his right to remain silent and that they necessarily cannot be spontaneous. While we do agree that defendant was in custody, we do not agree that after defendant invoked his Fifth Amendment right to silence, he was interrogated. The trial court's findings of fact include that after defendant signed a paper that he no longer wished to make a statement, the detective asked him nothing further at that time and began to fingerprint him. When Detective Roye took defendant's right hand, defendant exclaimed, "Ouch, take it easy." To that, Detective Roye inquired, "What happened to your hand?" And defendant replied, "I hit an oak tree." The detective asked, "[What] did you hit a tree for? A tree has never hurt anybody." Defendant replied, "I should have hit her a little harder so I could really hurt my hand."

In *State v. Porter*, 303 N.C. 680, 281 S.E.2d 377 (1981), a police officer had an armed robbery suspect in custody. The officer's supervisor asked if he recovered a bank bag. Defendant overheard the question and said to the officer, "The bank bag is in the car." The officer responded, "What bank bag?" and defendant Porter replied, "The bag from the robbery." We held under those circumstances that the defendant's remark was a volunteered statement, and that the officer's reply did not amount to an interrogation under *Miranda. Id.* at 692, 281 S.E.2d at 385. In the instant case, Detective Roye had no reason to believe his questions about defendant's hand were reasonably likely to evoke an incriminating response. It was defendant who called attention to his hand, and Detective Roye simply asked what he had done to it and why defendant would want to hit an oak tree. We conclude, under these circumstances, that defendant's remarks were volunteered statements, and Detective Roye's questions did not convert the conversation into an interrogation under *Miranda.*

**[5]** Defendant further contends that the trial court's failure to make a specific finding of fact as to who reinitiated conversation is a fatal defect. Once a defendant invokes his right to remain silent, it must be honored scrupulously. *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313 (1975). Assuming, *arguendo*, that it was error for defendant's statements to have been admitted without an exact finding as to who reinitiated conversation, any error was harmless beyond a reasonable doubt. *See State v. Eason*, 336 N.C. 730, 445 S.E.2d 917 (1994) (because evidence of defendant's guilt was overwhelming, the trial court's failure to specifically find as fact exactly who reinitiated conversation was harmless beyond a reasonable doubt), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 661 (1995). The evidence at the *voir dire* shows that when defendant was served with a warrant for assault with a deadly weapon with intent to kill inflicting serious injury, no one spoke to him, but he nevertheless stated, "This is for an assault on an oak tree." When served with the first-degree murder warrant, defendant remarked, "Well, that is good enough." In light of these later statements, in conjunction with the eyewitness testimony of Alice and other corroborating testimony, we find any error in the admission of defendant's earlier cryptic remarks concerning an oak tree, absent the finding as to who reinitiated conversation, to be harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988).

**[6]** Lastly, as to pretrial issues, defendant contends the trial court erred in its finding that defendant was not under the influence of alcohol and in its conclusion of law that defendant freely, knowingly,

intelligently and voluntarily waived his rights. Detective Roye testified on *voir dire* that defendant told the detective that he was under the influence of beer. The detective stated that although he could smell beer upon defendant and believed defendant had been drinking, the detective was not of the opinion that defendant was under the influence. Further, Detective Roye testified defendant indicated he remembered the first set of *Miranda* rights given to him in the patrol car, and that he understood each of his rights. Defendant then signed a waiver of rights form. The trial court found as fact that defendant was coherent and not confused, and that although defendant had been drinking, he was not under the influence of alcohol. The trial court then concluded as a matter of law that the defendant voluntarily, knowingly and intelligently waived his rights.

According to the record, the *voir dire* hearing was held on 15 January 1993, and the trial court denied the motion to suppress on 20 January 1993. The trial court entered its order into the record on 21 January 1993, after the trial had begun. Defendant argues that in light of testimony that he had been drinking before and after the murder (from Detective Roye during *voir dire* and from others during trial before the order was entered into the record), the trial court's finding of fact that defendant was not under the influence was unsupported by the evidence, and the conclusion of law that defendant voluntarily waived his rights was error.

Upon review of the testimony, we hold that the trial court's findings of fact were based upon competent evidence and, therefore, are binding upon appeal, even in the face of conflicting evidence. "An inculpatory statement is admissible unless the defendant is so intoxicated that he is unconscious of the meaning of his words." *State v. Oxendine*, 303 N.C. 235, 243, 278 S.E.2d 200, 205 (1981). We determine whether a statement was voluntarily given based upon the totality of the circumstances. *State v. Perdue*, 320 N.C. 51, 357 S.E.2d 345 (1987). The evidence supporting the findings of fact shows defendant was coherent and not confused. Defendant indicated he was able to understand and remember his rights. Nothing indicates defendant could not follow directions or respond appropriately to questioning. We cannot say, viewed under the totality of the circumstances, that the trial court's conclusion of law that the defendant voluntarily, knowingly and intelligently waived his rights was error. *See State v. McClure*, 280 N.C. 288, 185 S.E.2d 693 (1972) (no error in trial court's conclusion of law that defendant voluntarily made a statement when evidence showed defendant had been drinking heavily for three

weeks before the murder, and defendant could not remember either talking with police or signing a waiver of rights form).

[7] Also, under this assignment of error, in a footnote, defendant contends it was plain error for the prosecutor to elicit testimony from Detective Roye concerning defendant's invocation of his right to remain silent. Plain error is an error so basic and fundamental that justice cannot have been done. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). The record reveals Detective Roye testified that defendant denied any involvement in Christopher's murder and the assault on Alice. Detective Roye testified he told defendant that he needed to get a written statement from him. At this point, the jury was taken out of the courtroom and heard no testimony concerning defendant's exercise of his right to remain silent. There is no plain error here. This assignment of error is overruled.

JURY SELECTION ISSUES

[8] Defendant contends in his next assignment of error that his right to a fair and impartial jury was violated when the trial court unreasonably restricted *voir dire* of prospective jurors regarding their ability to consider a life sentence and when the trial court excused for cause prospective jurors who allegedly could consider, but were not enthusiastic about, the death penalty.

Defendant filed a pretrial motion requesting that he be allowed to conduct a "searching and thorough *voir dire* of prospective jurors based on their ability to consider mitigating circumstances and fairly determine punishment." The trial court denied the motion. Defendant now points to prospective jurors Clayton, Burgess, Owens and Odom and argues that the trial court improperly excused each for cause since each prospective juror's answers to questions concerning the death penalty were equivocal. Defendant claims that the trial court's summary denial of his motion resulted in defense counsel refraining from questioning these jurors once the State tendered them for cause. A prospective juror may be excluded because of his views on capital punishment when those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985).

Prospective juror Clayton's *voir dire* transpired, in part, as follows:

MR. BEARD: [A]re you saying that your feelings would substantially impair your performance of your duties as a juror in

**STATE v. WALLS**

[342 N.C. 1 (1995)]

connection with the death penalty if it got to recommending the death penalty?

Ms. CLAYTON: Yes.

. . . .

THE COURT: I said if you were selected to sit on this case, are you telling us that you would be unable to follow the law of this State because of your feelings about the death penalty?

Ms. CLAYTON: Yes.

Prospective juror Burgess' *voir dire* included the following:

MR. BEARD: [I]f you were satisfied beyond a reasonable doubt that the death penalty ought to be imposed, could you yourself recommend the death penalty knowing that the [c]ourt would follow your recommendation and impose the death penalty?

Ms. BURGESS: I'm not really sure. I honestly don't think that I could do that.

. . . .

MR. BEARD: So regardless, based on your own personal feelings, regardless of what the circumstances would be . . . you yourself would not be able to recommend the death penalty under any circumstances?

Ms. BURGESS: No, sir. I don't believe I could.

Prospective juror Owens' *voir dire* revealed the following:

MR. BEARD: Do I understand you correctly that you would not be able to recommend the death penalty based on your own personal feelings . . . ?

Ms. OWENS: Yes.

MR. BEARD: Are there any circumstances because of your own personal feelings against the death penalty knowing that the [c]ourt will follow your recommendation?

M[s]. OWENS: (Nodded head from side to side.)

MR. BEARD: Can you give me a yes or no answer?

M[s]. OWENS: No.

Finally, a portion of prospective juror Odom's *voir dire* proceeded in this manner:

STATE v. WALLS

[342 N.C. 1 (1995)]

MR. BEARD: Again, you yourself could not recommend the death penalty based on your own personal feelings, is that right?

MS. ODOM: Yes. As far as I am concern[ed] I could not recommend the death penalty. No.

We conclude that prospective jurors Clayton, Owens and Odom were ultimately unequivocal in their responses that they could not vote to impose the death penalty. As such, these prospective jurors could not follow the law and be fair and impartial jurors. Their excusal for cause was not error. As for prospective juror Burgess, the United States Supreme Court has recognized that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear.' " *Witt*, 469 U.S. at 424-25, 83 L. Ed. 2d at 852. Based on the superior vantage point of the trial court, its decision as to whether a juror's views would substantially impair the performance of his duties is to be afforded deference. *State v. Brogden*, 334 N.C. 39, 430 S.E.2d 905 (1993). In light of prospective juror Burgess' *voir dire* responses that she did not believe she could vote to impose the death penalty, we cannot say the trial court abused its discretion in determining her views would substantially impair the performance of her duties as a juror.

[9] Further, defendant appears to argue that the denial of his pretrial motion to conduct a searching and thorough *voir dire* created an environment in which defendant was not permitted to rehabilitate these four prospective jurors. We fail to see how the denial of the pretrial motion impacted on defendant's desire to rehabilitate. The motion denied by the trial court regarded whether jurors could be questioned concerning mitigating evidence, not whether defendant could rehabilitate jurors. There is absolutely no evidence whatsoever in the record that defendant faced, as he contends, any sort of hostile or discourteous environment from the trial court during *voir dire* as a result of the denial of the motion, such that defendant was restrained from rehabilitating any prospective juror.

[10] We further find that the trial court did not err in denying the motion. Defendant requested he be allowed "to ask whether prospective jurors can consider as a mitigating circumstance" evidence in regard to defendant's turbulent family history and mental retardation, among others. These questions are improper, as they amount to an impermissible attempt to stake out jurors. *See State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994) (not an abuse of discretion for the trial court to restrict defendant from asking whether a juror could "con-

sider" a specific mitigating circumstance in reaching a decision), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). Defendant was freely permitted to ask prospective jurors whether they could follow the trial court's instructions concerning mitigating circumstances, whether they understood they could individually find mitigating circumstances to exist, and whether their support for the death penalty was so strong that they would find it difficult to follow the law and consider a sentence of life imprisonment. We conclude it was not error for the trial court to deny the motion, and that the denial did not create an environment in which defendant was unable to rehabilitate prospective jurors.

[11] Defendant further argues, under this assignment of error, that the trial court erred by refusing to excuse prospective juror Bryant for cause in that he could not fairly consider a life sentence and by restricting defendant's *voir dire* of prospective juror Bryant.

Initially, we note that our statutory law provides that in order for a defendant to seek reversal on appeal of a trial court's refusal to excuse a juror for cause, the defendant must have:

(1) Exhausted the peremptory challenges available to him;

(2) Renewed his challenge as provided in subsection (i) of this section; and

(3) Had his renewal motion denied as to the juror in question.

N.C.G.S. § 15A-1214(h) (1988). In the instant case, the record reveals defendant failed to comply with this statutory mandate. Defendant failed to object to the trial court's denial of his challenge for cause and did not seek to renew his challenge as to juror Bryant. "The statutory method for preserving a defendant's right to seek appellate relief when a trial court refuses to allow a challenge for cause is mandatory and is the only method by which such rulings may be preserved for appellate review." *State v. Sanders*, 317 N.C. 602, 608, 346 S.E.2d 451, 456 (1986).

Even assuming defendant properly complied with N.C.G.S. § 15A-1214(h), he would not be entitled to relief. Prospective juror Bryant indicated he believed that anyone convicted of first-degree murder should receive the death penalty. However, upon further questioning, the following transpired:

THE COURT: The question is whether or not you can consider both penalties if we get to that stage of the trial?

MR. BRYANT: Yes, sir.

THE COURT: Are you[r] feelings so strong for the death penalty
. . . that you would not consider life imprisonment for a possible
sentence in the case?

MR. BRYANT: Yes, I would consider it.

MR. WARMACK: You could consider it?

MR. BRYANT: Yes, sir.

We were faced with a similar contention in *State v. Quesinberry*,
319 N.C. 228, 354 S.E.2d 446 (1987), and held it was not error for a
trial court to refuse to grant a challenge for cause, pursuant to the
standard in *Witt*, against a juror who expressed during *voir dire* that
every murderer should receive the death penalty, when the juror later
indicated he would follow the trial court's instructions and remain
open-minded regarding the appropriate sentence. *Id.* at 235, 354
S.E.2d at 450-51. Prospective juror Bryant, after initially indicating he
felt first-degree murderers should receive the death penalty, stated he
could consider both possible sentences and would follow the law. We
follow *Quesinberry* and hold that the trial court's refusal to excuse
him for cause was not error and did not violate *Witt*.

[12] Defendant also contends he was erroneously kept from asking
prospective juror Bryant three questions. Even assuming it was error
for the trial court to sustain objections to each of these questions, our
review of the record reveals that the questions were clearly a varia-
tion of the same theme: whether prospective juror Bryant's belief in
the death penalty was so strong that he could not consider life impris-
onment. Defendant was allowed to make this inquiry of prospective
juror Bryant, who responded he would consider a sentence of life in
accordance with the law. This assignment of error is overruled.

[13] In his next assignment of error, defendant, who is white, con-
tends the State exercised its peremptory challenges in a racially dis-
criminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79,
90 L. Ed. 2d 69 (1986).

"[T]he Equal Protection Clause forbids the prosecutor to chal-
lenge potential jurors solely on account of their race . . . ." *Batson*, 476
U.S. at 89, 90 L. Ed. 2d at 83. In *Batson*, the Court overruled *Swain v.
Alabama*, 380 U.S. 202, 13 L. Ed. 2d 759, *reh'g denied*, 381 U.S. 921, 14
L. Ed. 2d 442 (1965), and held "a defendant may make a prima facie
showing of purposeful racial discrimination in selection of the venire

by relying solely on the facts concerning its selection *in his case.*" *Batson*, 476 U.S. at 95, 90 L. Ed. 2d at 87.

In *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395 (1991), the Court restated the three-step process set out in *Batson* governing allegations that the State exercised its peremptory challenges in a discriminatory manner. First, defendant must make a *prima facie* showing that the State, on the basis of race, exercised its peremptory challenges. Second, if defendant makes such a showing, the burden is then upon the State to articulate race-neutral reasons for the peremptory challenges questioned. And third, the trial court must decide whether defendant has proven purposeful discrimination. *Id.* at 358-59, 114 L. Ed. 2d at 405. In this instance, we conclude the defendant has not made a *prima facie* case demonstrating that the State exercised its peremptory challenges on the basis of race.

The record reveals defendant failed to object to any of the prosecutor's peremptory challenges on the grounds they were racially based. "Defendant's failure to object to the prosecutor's challenges on this ground precludes him from raising this issue on appeal." *State v. Adams*, 335 N.C. 401, 411, 439 S.E.2d 760, 765 (1994). Even if defendant had timely objected at trial, nothing in the record before us demonstrates that the prosecutor exercised his peremptory challenges in a racially discriminatory manner. As defendant points out, it is true that the prosecutor used more peremptory challenges against blacks than whites. The prosecutor peremptorily excused ten potential jurors, seven of whom were black. During the selection of alternates, the prosecutor peremptorily excused five potential alternates, two of whom were black. Defendant argues "this numerical showing establishes a *prima facie Batson* violation." We cannot agree. We have held before that such numbers, standing alone, as they do here, are insufficient to make a *prima facie* case of racial discrimination. *See State v. Quick*, 341 N.C. 141, 459 S.E.2d 786 (1995); *State v. Beach*, 333 N.C. 733, 430 S.E.2d 248 (1993); *State v. Allen*, 323 N.C. 208, 372 S.E.2d 855 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 331 N.C. 746, 417 S.E.2d 227 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 775, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993); *State v. Abbott*, 320 N.C. 475, 358 S.E.2d 365 (1987). The jury which ultimately heard defendant's case was composed of seven blacks and five whites. We conclude, therefore, that defendant failed to carry his burden of establishing a *prima facie* case of racial discrimination in the prosecutor's exercise of peremptory challenges.

**STATE v. WALLS**

[342 N.C. 1 (1995)]

**[14]** Defendant further contends the prosecutor, as a matter of practice, consistently excludes blacks from jury service. Defendant cites to *State v. Spruill*, 338 N.C. 612, 452 S.E.2d 279 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 63, (1995); *State v. Smith*, 328 N.C. 99, 400 S.E.2d 712 (1991); *State v. Allen*, 323 N.C. 208, 372 S.E.2d 855; and *State v. Hall*, 104 N.C. App. 375, 410 S.E.2d 76 (1991), as examples of the prosecutor's alleged practice of racial discrimination in exercising peremptory strikes.[1] After carefully reviewing each case, we fail to find evidence that the prosecutor, as a matter of pattern and practice, exercised peremptory challenges in violation of the Equal Protection Clause. In *Spruill*, we held that the trial court did not err in concluding the defendant failed to establish a *prima facie* case of discriminatory use of peremptory strikes. *Spruill*, 338 N.C. at 633, 452 S.E.2d at 289. In *Smith*, we held that the defendant did establish a *prima facie* case of discriminatory use of peremptory challenges, but that the State responded with race-neutral reasons for each peremptory strike at issue. *Smith*, 328 N.C. at 126, 400 S.E.2d at 727. In *Allen*, we held that the defendant failed to make a *prima facie* showing of racial discrimination when the prosecutor accepted seven of seventeen black veniremen. *Allen*, 323 N.C. at 219, 372 S.E.2d at 862. In *Hall*, the Court of Appeals held that the trial court incorrectly considered the prosecutor's explanation for his use of peremptory strikes as relevant to whether the defendant made a *prima facie* showing of discrimination, rather than whether that showing had been rebutted. The Court of Appeals remanded for a resolution of that issue. *Hall*, 104 N.C. App. at 384, 410 S.E.2d at 81. We conclude in the instant case that defendant fails to show that the prosecutor, as a matter of practice in this case, or any other, exercised peremptory challenges on the basis of race alone. This assignment of error is overruled.

**[15]** In another assignment of error, defendant contends the trial court erred by denying defendant's motion to permit *voir dire* of prospective jurors concerning their attitudes on parole eligibility. We have held before that the trial court did not err by denying a defendant's motion to explore the issue of parole eligibility during jury *voir*

---

1. In defendant's brief on this point, defendant argues the prosecutor violated *Swain v. Alabama*, 380 U.S. 202, 13 L. Ed. 2d 759 (1965), through his practice of excluding blacks from jury service. However, as we noted earlier in this opinion, *Batson* overruled *Swain*, and now a defendant may demonstrate purposeful racial discrimination in the selection of a petit jury by relying only upon the facts regarding jury selection in that individual defendant's case. *Batson*, 476 U.S. at 95, 90 L. Ed. 2d at 87.

*dire. See State v. Spruill,* 338 N.C. 612, 452 S.E.2d 279; *State v. Skipper,* 337 N.C. 1, 446 S.E.2d 252; *State v. Green,* 336 N.C. 142, 443 S.E.2d 14, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 547 (1994). Defendant fails to advance a convincing reason why this Court should depart from its repeated holding on this issue. This assignment of error is overruled.

[16] In his next assignment of error, defendant argues that the trial court erred in permitting the prosecutor to ask prospective jurors the following question: "[O]ne of the witnesses who may testify in this particular case . . . may be a little slow . . . would you hold that against him in any way in this case?" Defendant now claims such questions impermissibly staked out prospective jurors, and as a result, he must receive a new trial. We decline to address this assignment of error, as the record reveals defendant failed to object at any time to this line of questioning. "Failure to make an appropriate and timely motion or objection constitutes a waiver of the right to assert the alleged error upon appeal . . . ." N.C.G.S. § 15A-1446(b) (1988); *see State v. Reid,* 322 N.C. 309, 367 S.E.2d 672 (1988). This assignment of error is overruled.

[17] In another assignment of error, defendant argues that it was error for the trial court to permit the prosecutor to question prospective jurors about whether they would feel sympathy toward the defendant because they would be able to see him each day of the trial, but would not be able to see the victim. Defendant contends a witness' credibility is for the jury to decide, and the question was improper, as the demeanor and mental capacity of a witness are factors the jury considers in deciding witness credibility. Defendant also argues the question was an attempt to stake out jurors.

In *State v. Smith,* 328 N.C. 99, 400 S.E.2d 712, this Court held the trial court did not abuse its discretion by allowing the State to ask potential jurors during *voir dire* whether they would feel sympathy toward the defendant, and not toward the victim, because they would see the defendant in court each day. The Court reasoned that the questions were not designed to suggest to jurors that they should disregard any sympathy they felt for the defendant, but rather, the question was to ascertain whether any jurors would feel sympathy for the defendant based solely upon his presence in court. *Id.* at 128-29, 400 S.E.2d at 729. We conclude that *Smith* governs our decision here, and we additionally hold that in the instant case, the question posed by the State was not an attempt to "elicit in advance what the juror's

STATE v. WALLS

[342 N.C. 1 (1995)]

decision will be under a certain state of the evidence or upon a given state of facts." *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976). Accordingly, the question did not stake out jurors. This assignment of error is overruled.

## GUILT/INNOCENCE PHASE ISSUES

[18] Next, defendant argues his Sixth Amendment right to counsel was violated when the trial court failed to resolve an alleged conflict of interest in defense counsel representing both defendant and a State's witness.

Just before the State called Eugene Norwood as a witness, the prosecutor, outside the presence of the jury, informed the trial court that one of defendant's attorneys, Mr. A. Jackson Warmack, had previously represented witness Norwood concerning a charge in district court. That charge was appealed, and at the time of defendant Walls' trial, witness Norwood's case was pending in superior court. The prosecutor told the trial court that he had questioned witness Norwood about the situation. Witness Norwood indicated he thought Mr. Warmack still represented him. The prosecutor stated that he wanted to bring this matter to the attention of the trial court so that any possible ethical conflict could be resolved before witness Norwood testified.

Mr. Warmack represented to the trial court that he "believe[d] [he] made a limited appearance" on behalf of witness Norwood in district court, but that since that time, Mr. Warmack had no further contact with witness Norwood, either concerning Norwood's case or defendant Walls' case. Mr. Warmack also told the trial court that he would not preclude himself from representing witness Norwood in the future. In Mr. Warmack's opinion, he felt there was no ethical conflict because "they're not codefendants[;] [t]here's nothing that's related about their cases." Finally, Mr. Warmack informed the trial court that Mr. Thomas Harvey, defendant's other counsel, would conduct the cross-examination of witness Norwood. The trial court then allowed Norwood to be called as a witness for the State, and Mr. Harvey conducted the cross-examination.

The United States Supreme Court, in *Cuyler v. Sullivan*, 446 U.S. 335, 64 L. Ed. 2d 333 (1980), determined that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest

adversely affected his lawyer's performance." *Id.* at 348, 64 L. Ed. 2d at 346-47. The factual situation in *Cuyler* involved three criminal defendants who were represented by the same two lawyers. Each defendant was tried separately; two were acquitted, and one, who rested his defense without putting on any evidence, was found guilty. The convicted defendant alleged his retained counsel had a conflict of interest because counsel also represented the other two defendants. The Court held "that the possibility of conflict is insufficient to impugn a criminal conviction." *Id.* at 350, 64 L. Ed. 2d at 348. While there apparently have been no previous cases before this Court identical to this specific fact situation, we believe that the principles in *Cuyler*, concerning the burden to be carried by a defendant in alleging that a conflict of interest violated his rights under the Sixth Amendment, are applicable to this case.

Defendant contends, in essence, that the trial court committed error *per se* by not inquiring "into these multiple representations." However, the Court in *Cuyler* noted that defense counsel are often in the best position to recognize when dual representation presents a conflict of interest; thus, they shoulder an ethical obligation to avoid conflicting representations and to promptly inform the trial court when a conflict arises. *Id.* at 346-47, 64 L. Ed. 2d at 345-46. "Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." *Id.* at 347, 64 L. Ed. 2d at 346. In the present case, the record reveals it was the prosecutor, not defense counsel, who alerted the trial court to the possibility of a conflict of interest. The trial court did inquire of Mr. Warmack as to the nature of his professional relationship with witness Norwood. Mr. Warmack told the trial court he thought he made only a limited appearance on behalf of witness Norwood and had no further contact with him after that point. Based on these circumstances, we find that the trial court did conduct an adequate inquiry into the alleged conflict of interest. "Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Id.* at 346-47, 64 L. Ed. 2d at 345-46. We do not perceive, based on the record before us, any special circumstances requiring the trial court to conduct any more extensive inquiry than the one it did conduct.

Even assuming, *arguendo*, that defense counsel did actively represent conflicting interests, defendant has not shown this Court that the alleged dual representation actually affected the adequacy of his

representation. In fact, our review of the record reveals that defendant received a quite vigorous and spirited defense. We note that co-counsel, Mr. Harvey, rather than Mr. Warmack conducted the cross-examination of witness Norwood. This fact, while not dispositive in and of itself, is significant when considered with the quality of the representation overall and the cross-examination, considering in particular whether opportunities for impeachment were ignored. The record shows that defense counsel objected to several lines of questioning during the course of witness Norwood's direct examination. Witness Norwood was then subjected to a detailed and thorough cross-examination, consuming some twenty-three pages in the transcript; witness Norwood was also recross-examined. He was questioned about the accuracy of certain photographs, his knowledge of the water levels near the boat landing and what witness McMichael had told him that McMichael had observed. Witness Norwood was also questioned about a man he encountered when he reached the boat landing, whether witness Norwood had asked the man's name and if the man had heard or seen anything relevant to the crime. Witness Norwood was not asked on cross-examination about the charges pending against him in superior court; however, we note that this area, including the exact nature of the charge and its status, was explored at the beginning of his direct examination. No ground was left for the defense to cover on this point. We cannot, from the facts before us, say that defendant's representation was affected by the alleged dual representation. Thus, we conclude that defendant has failed to carry his burden of showing that an actual conflict of interest adversely affected his lawyers' performance. This assignment of error is overruled.

[19] In his next assignment of error, defendant contends that the trial court's curtailment of the cross-examination of important prosecution witnesses deprived defendant of his right to confront the witnesses against him and his right to due process.

During the cross-examination of prosecution witness Karen Tucker, the defendant asked, "You weren't there on the day the child fell in the river, were you?" The State objected to "fell in the river," and the trial court sustained the objection. Defendant proposes that by sustaining the objection, the trial court violated its absolute duty of not commenting upon the evidence. The alleged comment upon the evidence, according to defendant, intimated to the jury that the defendant's theory that Christopher fell into the river, and was not thrown, was not valid.

A trial court "must abstain from conduct or language which tends to discredit or prejudice the accused or his cause with the jury." *State v. Carter*, 233 N.C. 581, 583, 65 S.E.2d 9, 10 (1951). However, a trial court's ruling on an objection falls far short of impermissible conduct or improper comment upon the evidence. Defendant's argument, that by simply sustaining an objection the trial court forced the jury to accept the State's theory of the case, is wholly without merit. We note that immediately before the question at issue, defendant asked Karen Tucker, "[A]ll of this that you're talking about happened on the day before the child fell in the river, right?" Tucker replied, "Yes, sir." We conclude that the trial court's singular act of sustaining an objection did not, in any perceptible or even minute way, amount to an improper comment upon the evidence.

[20] Defendant also argues the trial court placed "severe restrictions" upon defendant's cross-examination of Alice Bainbridge by sustaining objections to the following questions: "And because he [Christopher] wouldn't get near the water you didn't have to watch him as close as you might have to watch some kids when they get close to the water, right?" and, "Now, you told me that you don't remember telling Sheriff Woods on May the 30th that Buddy bought a 12-pack at Be Lo, do you remember saying . . . ?" Defendant contends that in light of the defense's theory of the case, the trial court's sustaining of the objections to these questions prevented defendant from adequately confronting the most important witness against him.

"[A]lthough cross-examination is a matter of right, the scope of cross-examination is subject to appropriate control in the sound discretion of the court." *State v. Coffey*, 326 N.C. 268, 290, 389 S.E.2d 48, 61 (1990); *see* N.C.G.S. § 8C-1, Rule 611 (1992). With regard to the first question defendant contends was improperly disallowed, according to the record, in a series of questions immediately prior to the question at issue, defendant elicited testimony from Alice that she could trust Christopher around the water because she knew the child was scared of the water and would not get near it. Thus, an answer to the excluded question would have been merely cumulative. With regard to the second question, defendant contends the objection was "incredibly sustained" on the grounds it was leading. We are, of course, aware that it is proper for counsel to lead a witness during cross-examination. N.C.G.S. § 8C-1, Rule 611(c). However, in propounding his question, defense counsel sought to testify himself. Once the question was properly phrased, defendant was allowed to

STATE v. WALLS

[342 N.C. 1 (1995)]

continue his cross-examination. We cannot say the trial court abused its discretion in sustaining objections as to these two questions.

[21] Next, defendant argues that the trial court improperly sustained the prosecutor's objections to defendant's attempt to elicit information from prosecution witness Eugene Norwood for the purpose of impeaching prosecution witness Melvin McMichael. Eugene Norwood was the police chief of Gaston, and Melvin McMichael had been a police officer in Gaston. Defendant contends it was error to sustain the objections to the following questions:

Q. You also are aware or involved in Mr. McMichael being part of the Scotland Neck town police department, is that correct?

MR. BEARD: Objection.

THE COURT: Sustained.

Q. [Y]ou also had several other serious complaints about Mr. McMichael's police work while he worked for the Town of Gaston before he was fired?

MR. BEARD: Objection.

THE COURT: Sustained.

Q. During the course of Mr. McMichael's employment, a situation arose including the certification by the State agency that gave you and the Town Board reasons to not be able to depend on Mr. McMichael['s] truthfulness and honesty, did you [sic]?

MR. BEARD: Objection.

THE COURT: Sustained.

Upon reviewing the questions posited by defendant, we conclude the trial court properly sustained the objections. As a general rule of evidence, the character of a witness cannot be proven by specific acts. 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 97 (4th ed. 1993). N.C.G.S. § 8C-1, Rule 608(b) provides that specific instances of the conduct of a witness may not be proved by extrinsic evidence. However, in the discretion of the trial court, such instances of conduct may be inquired into on cross-examination when the specific instances of conduct relate to "the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." N.C.G.S. § 8C-1, Rule 608(b). In other words, the impeachment questions propounded

by defendant, as clearly extrinsic evidence, would be proper only if Norwood had testified, in some fashion, as to McMichael's character for truthfulness or untruthfulness. We have reviewed the record and find no instance in which Norwood testified, in any way, concerning McMichael's character. Accordingly, the questions were impermissible, and the trial court correctly sustained the State's objections. The trial court did not abuse its discretion in disallowing these improper impeachment questions. This assignment of error is without merit and is overruled.

[22] Defendant argues in his next assignment of error that the trial court erred by submitting kidnapping as a charge to the jury. Defendant contends there was insufficient evidence to prove that Alice and Christopher Bainbridge were unlawfully removed or confined so that defendant could inflict serious bodily injury upon them.

N.C.G.S. § 14-39 provides that kidnapping occurs when any person unlawfully confines, restrains or removes from one place to another a person under the age of sixteen, absent parental consent, for the purpose of committing serious bodily harm or terrorizing such person. N.C.G.S. § 14-39(a)(3) (1993). Defendant proposes that a kidnapping charge should not have been submitted to the jury, as there was insufficient evidence to show defendant "confined" Christopher because Alice allegedly consented to both of them being in the car with defendant.

It is well settled that a defendant who, by force or threat of violence, takes a person against his will and carries him away is guilty of kidnapping. *State v. Penley*, 277 N.C. 704, 178 S.E.2d 490 (1971). "[K]idnapping is frequently committed by threats and intimidation . . . sufficient to put an ordinarily prudent person in fear for his life or personal safety, and to overcome the will of the victim and secure control of his person without his consent and against his will . . . ." *State v. Bruce*, 268 N.C. 174, 182, 150 S.E.2d 216, 223 (1966). A motion to dismiss should be denied when the State presents substantial evidence of each element of the crime charged. *State v. McDowell*, 329 N.C. 363, 407 S.E.2d 200 (1991). "Substantial evidence" means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). In evaluating a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, allowing every reasonable inference to be drawn therefrom. *State v. Benson*, 331 N.C. 537,

417 S.E.2d 756 (1992). We conclude the trial court did not err in submitting the underlying felony of kidnapping to the jury.

Taken in the light most favorable to the State, the evidence in the present case tends to show that during the ride to Richmond, defendant began to hit Alice in the face so severely that her glasses fell out of the car window. She pulled the car over to get the glasses from the highway, and as she walked back to the car, she heard Christopher scream out. Defendant hit, cursed and threatened to kill Christopher every time the child tried to get his drink out of the cooler. Defendant threw a beer can at the child. Alice heard Christopher grunt when it hit him. Once in Richmond, defendant kicked Alice in the face and took the car keys so she could not escape. He then made her drive to a house where he claimed he had friends who would kill her and the child. Defendant continued his physical and verbal assaults against Alice on the return trip from Richmond while the baby screamed and cried. Finally, when Alice could no longer see to drive, she pulled up to a welcome center, and defendant took over the driving. To keep Alice conscious, defendant continually struck her in the chest.

Defendant's claim that Alice consented to being in the car with defendant because she did not take her three-year-old child and run away, on foot, from defendant in Richmond is totally without merit. Equally unconvincing is his contention that an almost unconscious Alice consented to being in the car with defendant because she did not ask for help when they stopped at the welcome center. The determination of defendant's guilt or innocence of kidnapping was a proper question for the jury. It was not error for the trial court to submit the charge to the jury. This assignment of error is overruled.

In another assignment of error, defendant argues the trial court committed prejudicial error by denying defendant's request for jury instructions on second-degree murder and voluntary intoxication. Defendant contends that because he was intoxicated, he could not formulate the specific intent to kill, and he could not premeditate or deliberate. Thus, defendant argues it was error for the trial court to refuse to submit second-degree murder. Defendant relies upon *Schad v. Arizona*, 501 U.S. 624, 115 L. Ed. 2d 555, *reh'g denied*, 501 U.S. 1277, 115 L. Ed. 2d 1109 (1991) and *Beck v. Alabama*, 447 U.S. 625, 65 L. Ed. 2d 392 (1980), in support of his argument that not having the option of second-degree murder placed the jury in the untenable position of making a "Hobson's choice" between an outright acquittal and a guilty verdict.

[23] We first address the propriety of the trial court's denial of defendant's request for a jury instruction on voluntary intoxication.

A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the [S]tate, of his intoxication. Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

*State v. Mash*, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988). At the time of the murder, the evidence must show defendant's "mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *State v. Shelton*, 164 N.C. 513, 518, 79 S.E. 883, 885 (1913), *overruled on other grounds by State v. Oakes*, 249 N.C. 282, 106 S.E.2d 206 (1958). Defendant contends that testimony at trial demonstrated he was drinking the day before the murder, the day of the murder and the day after the murder. Defendant claims his cursing Alice and Christopher is evidence of his intoxication. Further, defendant told McMichael he could not move his car because he was drunk. However, the evidence shows defendant is an alcoholic, and his alcohol tolerance would be much higher than one who does not drink every day. Defendant ignores evidence showing that he was quick-witted enough to invent a lie when he told McMichael about an old dog, rather than a baby, being in the river. Defendant also successfully drove a car from the welcome center to the river and then to the defendant's brother's house. Defendant makes no claim he cannot remember his actions the day of the murder. Viewing this evidence in the light most favorable to defendant, as we must, we cannot say that defendant's "mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *Id.* We conclude from the evidence that defendant has failed to carry his burden to "produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill." *Mash*, 323 N.C. at 346, 372 S.E.2d at 536. It was not error for the trial court to refuse to instruct the jury on voluntary intoxication.

STATE v. WALLS

[342 N.C. 1 (1995)]

**[24]** We turn now to defendant's contention that he was entitled to a jury instruction on second-degree murder.

> The test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements.

*State v. Leroux*, 326 N.C. 368, 378, 390 S.E.2d 314, 322, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990). "Neither *Beck v. Alabama* nor *Schad v. Arizona* stands for the proposition that the lesser included offense should be more freely given in capital cases." *State v. Skipper*, 337 N.C. at 26, 446 S.E.2d at 265. First-degree murder is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Bonney*, 329 N.C. 61, 405 S.E.2d 145 (1991). Second-degree murder is the unlawful killing of another with malice, but without premeditation and deliberation. *State v. Fleming*, 296 N.C. 559, 251 S.E.2d 430 (1979).

In this case, we conclude that each element of first-degree murder, including premeditation and deliberation, was positively supported by the evidence, and that there was no conflicting evidence. The day before Christopher was killed, defendant forced Alice to drive to the boat landing. Once there, defendant grabbed a crying Christopher and swung him out over the water. Only when two fishermen spotted defendant did he put Christopher down, remarking that he would finish what he wanted to do later. The day of the murder, defendant threatened to kill both Alice and Christopher while he physically assaulted them. Defendant drove back to the same boat landing and threw Christopher into the water. Alice pleaded for defendant to help her find the child, but he refused. Then defendant attacked Alice, telling her she was going to join Christopher. Afterward, defendant drove away from the scene to his brother's house. Because evidence of defendant's intoxication was insufficient to support an instruction on voluntary intoxication, we find that other than defendant's denial that he committed the crime, there was no evidence to negate the elements of first-degree murder. *See State v. Lambert*, 341 N.C. 36, 460 S.E.2d 123 (1995). We conclude, then, in light of the positive evidence proving each element of first-degree murder, it was not error for the trial court to deny defendant's request for an instruction on second-degree murder and to deny submission of this issue to the jury. This assignment of error is overruled.

**[25]** In another assignment of error, defendant argues that the trial court committed reversible error in failing to intervene *ex mero motu* and censure the State's closing argument. Defendant alleges that the State's "grossly improper closing argument" infringed upon his rights to a fair trial, due process and freedom from cruel and unusual punishment.

Defendant contends that on two occasions the prosecutor impermissibly alluded to defendant's election not to testify on his own behalf by arguing, "the defendant may try to hide behind that legal conflict of reasonable doubt," and, "Was he going back down there to rescue Chris? Naw. No. The person who could tell what happened down there, you know, he went down there to finish what he'd started. He went down there to finish what he'd started which was to kill both of them."

As a general rule, "[p]rosecutors are granted wide latitude in the scope of their argument." *State v. Zuniga,* 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied,* 484 U.S. 959, 98 L. Ed. 2d 384 (1987). "[T]he facts in evidence and all reasonable inferences to be drawn therefrom," *State v. Huffstetler,* 312 N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied,* 471 U.S. 1009, 85 L. Ed. 2d 169 (1985), may be properly argued to the jury by counsel for each side. A prosecutor may not, however, refer to a defendant's election not to testify. *State v. Reid,* 334 N.C. 551, 434 S.E.2d 193 (1993). We note that defendant failed to object to either statement. In the absence of an objection, "the standard of review to determine whether the trial court should have intervened *ex mero motu* is whether the allegedly improper argument was so prejudicial and grossly improper as to interfere with defendant's right to a fair trial." *State v. Alford,* 339 N.C. 562, 571, 453 S.E.2d 512, 516 (1995). In the instant case, we conclude the prosecutor's statements do not constitute references to defendant's constitutional right to remain silent. Thus, the arguments were not so grossly improper that the trial court was required to intervene *ex mero motu.*

The State argues, and we agree, that the first statement was simply one part of the prosecutor's anticipatory rebuttal of various issues, either legal or factual, that might be raised by the defendant during his closing argument. Indeed, as a preface to this anticipatory rebuttal, the prosecutor argued, "I can only predict what some of the things [are] that I believe they will try to do. One of the things I think they will try to say is that there's some reasonable doubt." We find that the prosecutor's argument pertaining to defendant's probable

reliance upon reasonable doubt does not, in any way, refer to the defendant's failure to testify.

As for the second comment, we find it, too, did not reference defendant's election not to testify. When viewed in the context of the entire closing argument, it is clear the comment states a fact in evidence: that defendant was present at the boat landing and was the one person alive, apart from Alice, who knew what happened that afternoon. This argument, grounded in the evidence, was not improper.

Defendant also contends the following portion of the prosecutor's closing argument improperly appealed to the sympathy of the jury:

What does he do? Throws the boy in the water, sits there while the mama was screaming. You know, there's no love more than a mama's love for her child, for the mama sit [sic] there screaming for help——

MR. HARVEY: Objection.

THE COURT: Overruled.

——for help and he sits there holding that puppy, rubbing the puppy, and smiling. Just as mean as he can be. There's nothing to be said about that. It speaks for itself.

We conclude that this argument did not appeal to the jurors for their sympathy. Rather, the argument was firmly rooted in the evidence and was simply a description, as revealed by the evidence, of defendant's and Alice's actions at the river. As such, the argument was proper. This assignment of error is overruled.

SENTENCING PHASE ISSUES

In his next assignment of error, defendant argues that his constitutional rights were violated when the trial court, during the sentencing proceeding, refused to admit allegedly relevant mitigating evidence indicating defendant did not murder Christopher Bainbridge.

The record shows that after the jury had returned its verdict of guilty, but before sentencing commenced, Elton Gillikin, Jr., contacted both the district attorney and defense counsel regarding this case. Thereafter, during the middle of the sentencing proceeding, after presenting a number of witnesses, defendant proffered the hearsay testimony of Elton Gillikin, to which the State objected. On

STATE v. WALLS

[342 N.C. 1 (1995)]

*voir dire*, Gillikin testified that in October of 1992, Alice Bainbridge came to his house with his sister-in-law, Linda Hinkle, to borrow kerosene for Alice's oil drum. Linda apparently was staying with Alice at that time. Linda introduced Alice as "the woman whose child drowned in the river." Gillikin asked Alice what had happened. According to Gillikin, Alice told him she and defendant were fighting at the boat landing when the child, who was playing by the river, fell in. While Alice was in the river looking for the child, defendant came up from behind Alice and tried to drown her. Gillikin further testified on *voir dire* that once Alice learned he was a security guard, she changed her story and told him that the defendant "thr[ew] me and my son in the river." Gillikin stated he did not come forward with his testimony earlier because he had been out of town "from sunup to sundown" for the past four and a half weeks, did not take the paper and had only learned of the trial the day before his testimony. Gillikin stated he had only met Alice that one time at his house.

The State offered the testimony of nine witnesses in rebuttal of Gillikin's testimony. The first rebuttal witness was Alice Bainbridge, who testified that she had met Elton Gillikin more than once. Gillikin and his wife had come to Alice's house to ask Linda Hinkle to baby-sit the Gillikin children. Alice also agreed, during that meeting, to drive Bonnie Gillikin to work and to pick up Bonnie's children. Later, Alice and Linda went to the Gillikins' home to get money Alice was owed. It was at this meeting that Linda referred to Alice as the woman who was thrown into the river. Alice further testified that when Linda said Alice's child was pushed into the river, Alice corrected her and said the child was thrown into the river. Linda Hinkle testified that she was dating Alice's son, and that Alice never told Linda that her child fell into the river.

Next, the State called Gillikin's wife, Bonnie, who, after being reminded numerous times she was under oath and bound to tell the truth, testified her husband was prone to bragging and "adding things." While it is clear Bonnie Gillikin did not want to embarrass her husband, she testified she had not heard Alice say that Christopher had fallen into the river. Bonnie Gillikin also testified that when Linda said the child had fallen into the river, Alice corrected her and said the child was thrown into the river. Later in her testimony, Bonnie Gillikin claimed to remember that Alice had told her the child had fallen into the river. Bonnie Gillikin told her husband she did not want to be involved in the present situation. Mrs. Gillikin testified her husband was at home during the day and worked at night. She admitted

that her husband had bought five newspapers in the past several weeks and that she had been keeping up with the trial through the newspapers.

Thereafter, the State offered the testimony of a State Bureau of Investigation agent who corroborated Mrs. Gillikin's testimony and the testimony of four others who knew Elton Gillikin as a braggart, an untruthful person and one with a tendency to exaggerate to make himself look good.

At the close of the *voir dire*, although the State withdrew its objection to the testimony, the trial court ruled that the proffered testimony of Elton Gillikin was inadmissible.

Defendant takes the position that Gillikin's testimony should have been admitted in the sentencing proceeding on essentially two grounds: first, that it was mitigating evidence relevant to sentencing, and second, that it was evidence of a prior inconsistent statement of the State's primary witness and thus admissible for the purpose of impeachment with respect to the aggravating circumstances. Defendant contends the exclusion of this testimony deprived him of his constitutional right to present evidence and to "a fair trial during his sentencing proceeding," thus entitling him to a new trial.

[26] Regarding defendant's first contention, in *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), the United States Supreme Court concluded that the Eighth and Fourteenth Amendments dictate that a jury in a capital case must "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 57 L. Ed. 2d at 990; *accord* N.C.G.S. § 15A-2000(a)(3) (Supp. 1994); *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995), *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). "[H]owever, the ultimate issue concerning the admissibility of such evidence must still be decided by the presiding trial judge, and his decision is guided by the usual rules which exclude repetitive or unreliable evidence or that lacking an adequate foundation." *Pinch*, 306 N.C. at 19, 292 S.E.2d at 219. Specifically in this regard, *Lockett* notes that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior

record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n.12, 57 L. Ed. 2d at 990 n.12.

[27] Defendant first contends that the exclusion of Gillikin's testimony was error entitling defendant to a new trial on the ground it was mitigating evidence relevant to sentencing. Defendant argues (1) that evidence a person "is not even guilty of murder" is relevant to whether the State is permitted to execute that person, and (2) that this testimony was relevant as to one of the "circumstances of the offense." It is clear from this premise that defendant's thrust is that the question of guilt should be retried within the structure of the sentencing proceeding. Specifically, defendant argues in support that this Court has recognized "the potential value of residual doubt in the penalty phase of a capital trial." In fact, this Court has held the opposite, that residual doubt has no place in the sentencing phase. *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993). Further, defendant's premise rides on the horns of a rather obvious dilemma when he contends on the one hand that he "is not even guilty of murder" and thus there is no offense, and on the other hand that the testimony is relevant as to one of the "circumstances of the offense."

At the outset, we agree with defendant that testimony indicating the victim "fell" into the river is relevant to whether defendant committed murder. In fact, the only relevance this proposed evidence has is whether defendant is guilty of the murder of Christopher Bainbridge. However, such a question is reserved for and properly resolved in the guilt/innocence phase, and had Gillikin elected to present himself earlier in the proceedings, his testimony would have been admissible during the guilt/innocence phase. Of course, if Gillikin's testimony had been allowed, it, as well as Gillikin's credibility, would have been subject to the challenge of the State's examination and rebuttal. In this regard, we note that once Gillikin did see fit to surface with his information, defense counsel apparently did not consider it of sufficient import to move for a mistrial, opting instead to offer this testimony at the end of defendant's sentencing evidence. When the trial court did not allow its admission at that point, no motion was made for a mistrial.

Once the jury determines at trial, as it did here, that defendant is guilty of murder in the first degree, the sole remaining consideration, at the "separate sentencing proceeding," N.C.G.S. § 15A-2000(a)(1), is

the appropriate punishment, focusing on the defendant's character or record and any of the circumstances of the offense. As stated, we do not agree that residual doubt testimony is admissible during the sentencing proceeding of a capital case. In *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765, this Court recognized that "[l]ingering or residual doubt as to the defendant's guilt does not involve the defendant's character or record, or the circumstances of the offense," *id.* at 415, 417 S.E.2d at 779, and "is not a relevant circumstance to be submitted in a capital sentencing proceeding." *Id.* Furthermore, the United States Supreme Court has stated:

> ·At the outset, we note that this Court has never held that a capital defendant has a constitutional right to an instruction telling the jury to revisit the question of his identity as the murderer as a basis for mitigation. . . .

> . . . *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1 (1982) . . . in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's "character," "record," or a "circumstance of the offense." This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

*Franklin v. Lynaugh*, 487 U.S. 164, 172-74, 101 L. Ed. 2d 155, 165-66, *reh'g denied*, 487 U.S. 1263, 101 L. Ed. 2d 976 (1988).

In the present case, ·had the trial court allowed Gillikin's testimony indicating that Christopher "fell" into the river, jurors could only have used the testimony to revisit the question of defendant's guilt. Such reconsideration of any residual doubt a juror might have privately harbored as to defendant's guilt is irrelevant in determining defendant's appropriate sentence, as it does not bear upon an aspect of defendant's character, record or the circumstances of the offense. Accordingly, we conclude Gillikin's proposed testimony, assuming it was credible, was not relevant and admissible under the auspices of allowing jurors to reconsider any guilt phase residual doubts.

[28] Defendant further proposes Gillikin's testimony was admissible during sentencing for the purpose of impeaching the aggravating circumstances. Defendant's premise for this argument appears to be that the State's eyewitness to the murder, Alice Bainbridge, gave "wildly divergent" testimony concerning the events at the boat landing.

A review of the record reveals Alice testified upon direct examination that Christopher gave out one cry and one grunt when defendant pulled him from the car. According to Alice, she begged defendant to stop and tried to scream but could not until after defendant hurled the child into the river. This is not "wildly divergent" from McMichael's and Floyd's testimony that they were unaware things had gone awry until they, fishing at the bottom of the hill, heard a splash. We also note that both Alice and Christopher's teacher testified that the child was terrified of water and would not go near it. Further, there remains uncontradicted testimony from Alice, McMichael and Floyd that as Alice begged McMichael and Floyd to help her find her baby, defendant steadfastly told them only an old dog, and not a baby, was in the river. Defendant then smiled, pulled a puppy out of the car, and began to pet it. When McMichael asked defendant to move his car so he and Floyd could go get help, defendant refused, complying only when McMichael pulled out his gun. Also, the evidence showed defendant threatened to kill Christopher and Alice numerous times, and only the day before the murder, at the same site, defendant was seen by fishermen swinging a crying Christopher out over the water. Defendant put Christopher down and remarked he would do what he wanted to do later. The testimony of Alice was corroborated by a number of other witnesses.

Even assuming Gillikin's testimony was credible, and bearing in mind that evidentiary flexibility is encouraged in capital cases, we nevertheless conclude that the proposed testimony does not impeach Alice's credibility with regard to any of the three aggravating circumstances submitted to and found by the jury. The question of whether the victim "fell" into the river has no bearing on whether the determined "capital felony" or "murder" was committed during the commission of a kidnapping; or was especially heinous, atrocious, or cruel; or was part of a course of conduct including the commission of other crimes of violence. Rather, as stated, this question has relevance only to whether a murder was committed in the first place, not as to *how* it was committed.

[29] Lastly, defendant argues that his position is similar to, and supported by, the United States Supreme Court's ruling in *Green v. Georgia*, 442 U.S. 95, 60 L. Ed. 2d 738 (1979) (per curiam). There, the Supreme Court held that the hearsay testimony of a witness for the State in a prior, separate trial of a codefendant, regarding that codefendant's private confession that he was the actual shooter, was relevant at the sentencing phase, and its exclusion violated the Due

Process Clause. In arriving at its decision, the Court placed reliance upon several circumstances concerning the confession that enhanced its reliability:

> Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it.

*Green*, 442 U.S. at 97, 60 L. Ed. 2d at 741. We find that *Green* is of no help to defendant in the case *sub judice*. First and foremost, the State never relied upon Gillikin's testimony, and this case is fundamentally different factually from *Green*. There is no codefendant or other person charged with defendant in this case. Either defendant did the actual killing, and in the manner described by witnesses, or he did not. There are no comparisons of culpability here. Further, Gillikin's proposed testimony lacks any of the indicia of reliability as found in the testimony in *Green*. Gillikin's wife, Bonnie, though an obviously reluctant witness, testified she never heard Alice say her child fell into the river. Bonnie admitted her husband was often wont to exaggerate and fabricate stories in order to make himself look good. She stated her husband had purchased five newspapers during the course of the trial, and that the two had been keeping up with the trial via the newspapers.

In light of the irrelevance of the proposed testimony, its dubious nature and the manner in which it was dealt with by defense counsel, we conclude the exclusion of this evidence was not error. This assignment of error is overruled.

[30] By another assignment of error, defendant contends the trial court erred in submitting the statutory mitigating circumstance that "[t]he defendant has no significant history of prior criminal activity," N.C.G.S. § 15A-2000(f)(1), as the evidence presented did not support the circumstance.

In ruling upon whether to submit N.C.G.S. § 15A-2000(f)(1), the trial court "is required to determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity." *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604

(1988). "Once the trial court determines that the jury could reasonably find a mitigating circumstance, [N.C.G.S. § 15A-2000(b)] affords the trial court no discretion in submitting the mitigating circumstance." *State v. Lloyd*, 321 N.C. 301, 312, 364 S.E.2d 316, 323, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18, *on remand*, 323 N.C. 622, 374 S.E.2d 277 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 329 N.C. 662, 407 S.E.2d 218 (1991). Once the mitigating circumstance is submitted to the jury, it is for the jury to decide whether the criminal activity of the particular defendant is significant or not. *Wilson*, 322 N.C. at 143, 367 S.E.2d at 604. We define "significant" within the context of N.C.G.S. § 15A-2000(f)(1) as likely to have influence or effect upon the determination by the jury of its recommended sentence. *See Wilson*, 322 N.C. at 147, 367 S.E.2d at 609 (Martin, J., concurring).

According to the record, defendant has convictions for driving while impaired, assault, communicating threats and escape, nonfelonious breaking and entering, receiving stolen goods, possessing a stolen vehicle and possessing stolen credit cards. What is of import in the trial court's determination of whether a rational juror could reasonably find this mitigating circumstance to exist is the nature and age of the prior criminal activities, rather than the mere number of criminal activities. *See State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). We have upheld the submission of this particular mitigating circumstance based upon criminal activities equal to or greater than the defendant's in the present case. *See State v. Turner*, 330 N.C. 249, 410 S.E.2d 847 (1991) (a reasonable juror could have found that defendant had no significant history of prior criminal activity where defendant had been convicted of the misdemeanor offenses of receiving stolen goods, larceny, worthless check and assault with a deadly weapon, and his criminal activity included possession of marijuana, theft and possession of a sawed-off shotgun); *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (prejudicial error for the trial court to refuse to submit the no significant history of prior criminal activity mitigator where defendant had a prior felony conviction for second-degree kidnapping and had other criminal activity including storage of illegal drugs and participation in the theft of farm machinery). In light of our precedent and the nature of defendant's criminal activities, we cannot say the trial court erred in determining that a rational juror could rea-

sonably find defendant's prior criminal activities not to be significant. This assignment of error is overruled.

[31] In a related assignment of error, defendant argues that by submitting the no significant previous criminal activity mitigating circumstance over defendant's objection, the trial court placed an untenable burden upon defendant to prove the existence of a mitigating circumstance unsupported by the evidence. Defendant contends it thus appeared to the jury that he had "pled guilty to an element which was necessary to the imposition of the death sentence" and trivialized the remaining mitigating circumstances. Defendant further implies that the prosecutor sought the submission of this mitigating circumstance in order to surreptitiously slip a *de facto* aggravating circumstance, not contemplated by the legislature, into the sentencing proceeding.

We reiterate that the trial court has *no* discretion as to whether to submit this mitigating circumstance if evidence has been presented concerning defendant's previous criminal activity and the trial court determines a rational juror could reasonably find the previous criminal activity not significant. *See Lloyd,* 321 N.C. at 311-12, 364 S.E.2d at 323. In this case, the defendant, through his psychiatrist, elected to present evidence concerning defendant's previous criminal activities, and we have concluded that the trial court did not err in determining that a rational juror could find that those activities were not significant. Accordingly, the trial court had no discretion in submitting the mitigating circumstance in N.C.G.S. § 15A-2000(f)(1) to the jury. Once submitted, it was proper for the prosecutor to argue to the jury regarding what weight the jury should assign this mitigating circumstance. *See State v. Craig and State v. Anthony,* 308 N.C. 446, 302 S.E.2d 740, *cert. denied,* 464 U.S. 908, 78 L. Ed. 2d 247 (1983).

[32] Defendant argues he was denied effective assistance of counsel by the submission of the mitigating circumstance in N.C.G.S. § 15A-2000(f)(1) and cites *State v. Harbison,* 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied,* 476 U.S. 1123, 90 L. Ed. 2d 672 (1986), as support for this proposition. However, we do not find *Harbison* applicable in this instance. First, *Harbison* applies only to the guilt/innocence phase of a trial. In *Harbison,* this Court held that in cases in which the defendant's counsel, without consent from the defendant, admits defendant's guilt to the jury, the defendant has been denied effective assistance of counsel, *per se* in violation of the Sixth Amendment. *Id.* at 180, 337 S.E.2d at 507-08. In the present case,

defendant appears to contend that because defense counsel argued to the jury with respect to this mitigating circumstance, "I'm not going to ask you to answer that 'yes' ladies and gentlemen," this equates to admitting defendant's guilt, in that jurors may have considered this mitigating circumstance as an aggravating circumstance. This argument appears to overlook the fact that defendant himself first placed the evidence of his criminal record before the jury, in the form of testimony about his prior convictions, thus establishing his prior guilt. We therefore conclude that defense counsel's statement that the jury would not be asked to find this mitigator is not tantamount to admitting defendant's guilt before a jury against defendant's wishes and did not violate defendant's Sixth Amendment right to effective assistance of counsel. Further, it does not follow, as defendant suggests, that because no juror found any of the submitted mitigating circumstances to exist, the jurors used the no significant previous criminal activity mitigator as a *de facto* aggravator. Indeed, the Issues and Recommendation form itself precludes such a result. This assignment of error is overruled.

[33] In another assignment of error, defendant contends the trial court erred by either refusing to submit or combining the mitigating circumstances defendant requested. According to defendant, this ran afoul of the Eighth and Fourteenth Amendments and violated North Carolina law which requires a trial court to submit, for the jury's consideration, any circumstance requested by defendant which is supported by the evidence and is capable of being understood as mitigating by a reasonable juror. Specifically, defendant points to twelve mitigating circumstances he requested be submitted to the jury and contends that each circumstance was so distinct that it warranted separate submission to the jury.[2]

---

2. Defendant argues the following mitigating circumstances should have been separately submitted to the jury: (1) defendant was suffering from a mental condition that was insufficient to constitute a defense, but significantly reduced his culpability for the offense; (2) defendant was suffering from a physical condition that was insufficient to constitute a defense, but significantly reduced his culpability for the offense; (3) defendant's mother was diagnosed with schizophrenia, catatonic type, in 1954; (4) defendant's mother was institutionalized four times during the defendant's childhood, each time for more than a year at a time; (5) defendant was unsupervised much of the time, and consequently, his school attendance was poor; (6) defendant only obtained an eighth grade education; (7) defendant began drinking alcohol when he was fifteen or sixteen years old in response to his environment and the stress he was under; (8) defendant was raised in an abusive family situation in which violence was used to discipline family members; (9) defendant did poorly in school from the first grade on, dropping out of school before the eighth grade; (10) defendant was a chronic abuser of alcohol and/or drugs on 23 May 1992 and had consumed some quantity of alcohol

**STATE v. WALLS**

[342 N.C. 1 (1995)]

This Court held "[t]he refusal of a trial judge to submit proposed circumstances separately and independently is not error." *Skipper*, 337 N.C. at 55, 446 S.E.2d at 282. It is not error for a trial court to refuse to submit a mitigating circumstance proffered by defendant when that circumstance is subsumed into another mitigating circumstance which is submitted to the jury. *See State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). Defendant argues that proposed circumstances three, four, five and twelve should have been submitted because "evidence of familial pathology is mitigating." The record reveals that the trial court did submit the following nonstatutory mitigating circumstance: defendant's mother was largely absent from the home during his childhood due to mental illness. We conclude that defendant's proposed circumstances three, four and five are subsumed within the circumstance the trial court submitted to the jury. Further, the fact that defendant's alleged mental illnesses are hereditary is not mitigating; rather, what is potentially mitigating is the fact of their existence. This mitigating aspect of defendant's character was presented to the jury through the following submitted circumstances: the capital felony was committed while defendant was under the influence of a mental or emotional disturbance, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, on several occasions defendant has sought mental health-care, and the catchall circumstance.

Defendant argues that proposed circumstances five, six and nine should have been submitted because although the trial court did submit that "defendant's school attendance was poor and he obtained only an eighth grade education," this encompassed only the bare fact that defendant had poor school attendance while leaving out the mitigating evidence that it was defendant's lack of supervision which contributed to his school absences. We conclude that defendant's proposed circumstances were subsumed in the circumstance submitted to the jury. Further, the record does not reveal evidence that defendant was unsupervised most of the time. Defendant's sister testified that as children, they lived with their grandparents during school holidays, and that they "had a pretty good childhood."

Defendant further contends proposed circumstances one, two, seven, ten and eleven should have been submitted to the jury because

and/or drugs at that time; (11) defendant suffered from a personality disorder with paranoid, narcissistic and schizotypal features at the time of the commission of the crime; and (12) defendant's mental condition is a hereditary result of his mother's chronic undifferentiated schizophrenia.

these circumstances reflect the facts which explain defendant's problems with drinking and his diminished capacity. However, the trial court did submit the following circumstances: the murder was committed while defendant was under the influence of a mental or emotional disturbance, defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired, defendant's problems with alcohol are longstanding and chronic, virtually all of the defendant's troubles with the law have been related to alcohol use, and defendant has sought mental-health care on several occasions. We conclude, here again, that defendant's proposed circumstances were subsumed into the circumstances actually submitted to the jury.

Finally, defendant argues that proposed circumstance eight should have been submitted, as it was supported by Dr. Brown's testimony at sentencing. According to the record, Dr. Brown testified it was his "understanding that [defendant] was abused as a child emotionally and physically." However, the record reveals that no one, including defendant's sister and brother, testified that physical violence was used to discipline family members. In light of Dr. Brown's qualified answer, and the lack of other supporting testimony from those in a position to have personal knowledge, we conclude that no credible evidence supported the submission of this proposed circumstance.

In sum, we conclude the trial court did not err in tailoring defendant's proposed mitigating circumstances to the evidence presented at the sentencing phase. This assignment of error is without merit and is overruled.

[34] In his next assignment of error, defendant argues, for a variety of reasons, that the State's closing arguments during sentencing urged the jury to find defendant guilty based on fear and unreasoned prejudice, not upon the evidence presented.

First, defendant contends that the bulk of the State's closing argument was a sermon "clearly [telling] the jury that North Carolina's capital punishment statute was a statute of judgment enacted by a government 'ordained by God.'" Defendant objected to this line of argument, and on appeal, defendant points out that this is a case of first impression because in other capital cases in which error has been assigned to biblical arguments, no timely objection was made at trial. Thus, this Court reviewed such arguments to determine whether they amounted to such gross impropriety as to require the trial court

to intervene *ex mero motu. See State v. Hunt*, 323 N.C. 407, 373 S.E.2d 400 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 330 N.C. 501, 411 S.E.2d 806, *cert. denied*, 505 U.S. 1226, 120 L. Ed. 2d 913 (1992); *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991); *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). "[T]his Court has repeatedly noted the wide latitude allowed counsel in arguing hotly contested cases, *e.g., State v. Britt*, 288 N.C. 699, 220 S.E.2d 283 (1975); *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, and it has found biblical arguments to fall within permissible margins more often than not." *Artis*, 325 N.C. at 331, 384 S.E.2d at 500. However:

This Court has in the past disapproved of prosecutorial arguments that made improper use of religious sentiment. *See, e.g., State v. Moose*, 310 N.C. 482, 501, 313 S.E.2d 507, 519-20 (1984) (argument that the power of public officials is ordained by God and to resist them is to resist God disapproved); *State v. Oliver*, 309 N.C. 326, 359, 307 S.E.2d 304, 326 (1983) (indicating the impropriety in arguing that the death penalty is divinely inspired).

*State v. Ingle*, 336 N.C. 617, 648, 445 S.E.2d 880, 896 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 222 (1995).

We have reviewed the prosecutor's argument in its entirety and note that the prosecutor argued to the jury, "We're talking about the powers of government. And I'm not saying, well, that we're trying this case by Biblical law because we're not. We are trying this [case] by man's law, North Carolina statutes." Inasmuch as the prosecutor's argument clearly informed the jury that it was to make its sentencing decision based upon N.C.G.S. § 15A-2000, and not the Bible, we conclude the argument was not improper.

[35] Second, defendant argues the prosecutor blatantly appealed to the sympathy and passion of the jurors by telling them to "send a thunderous message to anybody who would think about committing such a wicked, evil, heinous act in the borders of the county" and that this crime was a "senseless, merciless, heartless murder." This overt play to the jurors' sympathies, according to defendant, continued when the prosecutor argued, "If this [murder] is not . . . sufficiently substantial to call for the imposition of the death penalty, ladies and gentlemen, we might as well forget it and go home and never call another jury to come back up here to look at another . . . death

penalty [case] again." Defendant interprets these arguments as tanta-mount to informing the jury that it should respond to community pressure and impose the death penalty. We disagree with defendant's interpretation.

In *State v. Moseley*, 338 N.C. 1, 449 S.E.2d 412 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 738 (1995), this Court held that a prosecutor's argument to jurors that they "are the voice" and "the conscience of the community" was proper and did not ask jurors to render a verdict based upon public sentiment. In this instance, despite defendant's urging, we do not perceive that the prosecutor's words relayed to the jury that it should buckle under the pressure of the community and impose death. This Court has also held that it is proper during closing arguments "for the prosecutor to ask for the highest degree of conviction and the most severe punishment available." *State v. Olson*, 330 N.C. 557, 568, 411 S.E.2d 592, 598 (1992). We conclude that the prosecutor's arguments were proper and merely reminded the jury that its verdict would send a message to the people of Northampton County, and that this murder was deserving of the death penalty, the highest punishment available.

[36] Third, defendant contends the prosecutor improperly argued to the jury that it should return a sentence of death because of the characteristics of the victim and the feelings of his family. Defendant apparently finds offense in the prosecutor's reference to Christopher as a "little, bitty boy" and that Christopher "wanted to live, . . . appreciated the little things in life . . . [and] loved to play." Defendant apparently did not hear this argument in the context he would now like it to be heard since he failed to object. As this argument was rooted in the evidence, it was proper and did not require the trial court to intervene *ex mero motu*. Defendant also contends Christopher's age was used as a reason to impose the death penalty when the prosecutor quoted from the Bible that "whoso shall offend one of these little ones . . . it were better for him that a millstone were hanged around his neck, and that he were drowned in the depth of the sea." Here again, defendant failed to object at trial, and we find this argument fails to rise to the level of gross impropriety requiring the trial court to censor the argument *ex mero motu*.

[37] Defendant further contends that the prosecutor reached the "nadir of [his] blatant appeals to [the] passion and prejudice" of the jury when in arguing the existence of the especially heinous, atrocious, or cruel aggravating circumstance, the prosecutor reminded

the jury that Christopher lay on the river bottom, conscious, for four minutes, and then the prosecutor said, "I'm not going to say anything for four minutes. Just think about it. This is especially, heinous, atrocious and cruel. (Silence)." Defendant's objection, apparently only made after some two minutes of silence, was overruled by the trial court. In a strikingly similar case, this Court found an argument, during which the prosecutor clocked a four-minute long pause and asked jurors to hold their breath as long as they could to better understand manual strangulation and how long four minutes is during that context, to be neither improper nor prejudicial. *Artis*, 325 N.C. at 323-24, 384 S.E.2d at 496-97. This Court reasoned that during the sentencing phase of a capital trial, as opposed to the guilt phase, the emphasis is upon the nature of the offense and the character of the defendant. As such, the prosecutor's argument was held to be within the bounds of propriety. *Id.* In this instance, we find *Artis* controlling of this issue and conclude the prosecutor's argument, made in the context of the sentencing phase of a capital trial, was proper.

[38] Fourth, defendant contends the prosecutor improperly attacked the integrity of defendant's expert witness by referring to him as a "paid psychiatrist." We note that defendant apparently heard nothing prejudicial in this reference, as he did not object at trial. Further, we simply fail to perceive how a reference to defendant's expert witness as a "paid psychiatrist" translates, as defendant would have it, into an argument that the witness would testify to anything for money. Rather, the prosecutor simply stated the fact that the witness was paid. This is proper. *See State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994) (proper to cross-examine a witness concerning his status as a paid witness and to argue to the jury the importance of the testimony from the State's perspective), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995).

[39] Fifth, defendant contends the prosecutor denigrated defendant by referring to him as the horror movie characters "Jason" and "Freddie Kruger" and as "that devil." However, taken in the context in which it was made, the prosecutor did not call defendant "Jason" or "Freddie Kruger." Rather, the prosecutor argued to the jury that this case was "about *Friday the 13th* and Jason . . . [i]t ain't about no *Casablanca*[, it's about] Freddie Kruger and nightmares." Such an argument was not improper. As for defendant's claim that he was characterized as a "devil," again, in the context in which it was made, the prosecutor merely was emphasizing that defendant was not like the angel in the poem *Little Boy Blue*, which he had just read to the

jury. *See State v. Willis*, 332 N.C. 151, 171, 420 S.E.2d 158, 167 (1992) (prosecutor's argument that "when you try the devil, you have to go to Hell to find your witnesses" was not a characterization of the defendant as a devil).

**[40]** Defendant next contends that the prosecutor improperly suggested to the jury that defendant was not entitled to constitutional protections when the prosecutor noted that Alice and Christopher had no lawyer, no jury, no bailiff, no judge and no legal rights. We do not read into the prosecutor's argument that it was an attack on defendant's exercise of his constitutional rights. The prosecutor merely argued to the jury that defendant, as judge, jury and executioner, single-handedly decided Christopher's fate.

Defendant also proposes that the prosecutor improperly attacked defendant's right to counsel when he mentioned that defendant conferred with his attorneys and his psychiatrist before defendant related his version of the incidents the day of the murder. Again, when taken in context, we conclude the argument failed to impinge upon defendant's right to counsel. Rather, the prosecutor merely argued from Dr. Brown's report that defendant was reluctant to talk about the murder until he was reassured by his counsel and psychiatrist. The prosecutor then rhetorically asked jurors, "Why was [defendant] nervous? Why was he paranoid?"

**[41]** Finally, defendant contends that when the prosecutor argued to the jury that "by signing that issue sheet, you are not signing [defendant's] death warrant," the prosecutor violated *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231 (1985), in which the United States Supreme Court held that a prosecutor's argument that the jury need not worry about making mistakes in imposing the death penalty because an appellate court would review its decision violated the Eighth Amendment by diminishing the jury's sense of responsibility and contributing to an unreliable death sentence. In the present case, according to the record, the comment to which defendant assigns error was made during an argument that "[we]'re the master of our destiny [and] we are responsible for the consequences of our actions." The thrust of the prosecutor's argument was not that the jury's decision was not final, but rather, that it was the defendant, who by choosing his course of actions, signed his own death warrant. We also note that the prosecutor argued to the jury, "As you already know, whatever you recommend will be what the defendant gets." The jury could not have understood the prosecutor's argument to

mean it was relieved of the responsibility to recommend a sentence in this case, especially when the argument contained no reference to the defendant's right to appeal the jury's sentencing recommendation. There is no *Caldwell* error here. *See State v. Jones,* 339 N.C. 114, 451 S.E.2d 826 (1994) (prosecutor's argument that defendant gave himself the death penalty did not impermissibly diminish the jury's responsibility to recommend a sentence), *reconsideration denied,* 339 N.C. 618, 453 S.E.2d 188, *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 873, *reh'g denied,* —— U.S. ——, 132 L. Ed. 2d 913 (1995).

In sum, after careful review, we conclude that each of defendant's arguments under this assignment of error is without merit and is hereby overruled.

[42] By his next assignment of error, defendant asserts that without "judicial clearance," the prosecutor elicited improper character evidence regarding defendant through defendant's brother, Ronald Walls, and that the prosecutor badgered the witness and asked questions designed to put incompetent and prejudicial information before the jury.

In his brief, defendant claims that despite the fact that Ronald Walls was never asked about defendant's reputation for nonviolence, peaceableness, veracity or any other character trait, the prosecution was improperly allowed to elicit such information. However, the record reveals that during direct examination, in response to a question concerning whether Ronald had observed that defendant's behavior had changed in the past years as his alcohol consumption increased, Ronald made the following reply: "Well, Buddy [defendant] is basically a good human being; . . . he's not . . . real violent; . . . he's not really a trouble[-]maker either." Further, in response to defense counsel's question concerning whether defendant's drinking affected his life during the past few years, Ronald volunteered, "I've never drunk or sober ever saw him mistreat a child in any way. No way whatsoever . . . I've never known him to spank one of his own children or—I know his mother-in-law was having to do it because he didn't believe in hurting a child, spanking one."

Here, we agree with the State that the door was opened through Ronald Walls' direct examination to questions on cross-examination regarding specific instances of misconduct toward defendant's wives, Alice, and Christopher. *See, e.g., State v. Syriani,* 333 N.C. 350, 428 S.E.2d 118, *cert. denied,* —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied,* —— U.S. ——, 126 L. Ed. 2d 707 (1994). Defendant further

argues that some of these questions on cross-examination rose to the level of prosecutorial misconduct requiring a new trial.

A defendant is entitled to a new trial when improper prosecutorial conduct prejudices the defendant, affecting his right to a fair trial. *State v. Phillips*, 240 N.C. 516, 82 S.E.2d 762 (1954) (persistent and flagrant violations of the rules governing cross-examination required reversal when prosecutor's questions assumed the unproven insinuations in them to be facts). However, where there is no reasonable possibility that the misconduct affected the outcome of the trial, there is no need for a reversal. *State v. Whisenant*, 308 N.C. 791, 303 S.E.2d 784 (1983) (improper question regarding defendant's criminal history did not warrant new trial where, in light of the overwhelming evidence of defendant's guilt, there was no reasonable possibility that had the question not been asked, a different result would have been reached at trial).

We note that the trial court promptly sustained the defendant's objections to many of the questions presently at issue. While it appears the prosecutor did persist in some lines of improper questioning, we cannot say there is a reasonable possibility the outcome of the trial would have been different had the questions not been propounded. N.C.G.S. § 15A-1443(a).

**[43]** Under this assignment of error, defendant also argues that the prosecutorial misconduct continued with the cross-examination of Dr. Brown. Defendant cites *State v. Coffey*, 336 N.C. 412, 444 S.E.2d 431 (1994), as support for his propositions that the cross-examination was not relevant to rebut the no significant history of prior criminal activity mitigating circumstance, and that the cross-examination was not relevant to confront the basis of Dr. Brown's expert opinion under Rule of Evidence 705.

We find, however, that defendant interprets *Coffey* much broader than its actual holdings. The defendant in *Coffey* was charged in 1986 with the first-degree murder of a ten-year-old girl. The murder occurred in July 1979. At the capital sentencing proceeding, defendant presented the opinions of two mental health expert witnesses. Both experts testified that in their expert opinion, defendant suffered from pedophilia. On cross-examination, it was revealed that each doctor based his diagnosis of pedophilia, in part, upon defendant's convictions in 1974 and 1986 of indecent liberties involving children. This Court rejected the State's argument that the cross-examination concerning defendant's pedophilia conviction *in 1986* was relevant

**STATE v. WALLS**

[342 N.C. 1 (1995)]

to rebut the no significant history of criminal activity mitigating circumstance. By taking into consideration the language of the mitigator and its relation to the sentencing proceeding, this Court specifically held "that the history of prior criminal activity refers to defendant's criminal activity prior to the murder for which he is being sentenced, not prior to sentencing." *Coffey*, 336 N.C. at 417, 444 S.E.2d at 434. Because defendant's 1986 conviction did not occur prior to the murder, it was not relevant to rebut the no significant prior criminal activity mitigating circumstance. *Id.*

Turning to the instant case, defendant presents us with no argument that all, or even a portion, of his prior criminal activity occurred between the murder and sentencing. Accordingly, *Coffey* has no application to the case at bar. Earlier in this opinion, we held that based upon the nature of the offense, a rational juror could have found defendant's prior criminal activity as not significant. The prosecutor was, therefore, placed in the position of having to rebut, if possible, the existence of this mitigator. During his direct examination, Dr. Brown testified about defendant's criminal activity and drug abuse. We conclude that the cross-examination questions presently at issue were relevant to rebut the mitigator, and that, accordingly, the trial court did not abuse its sound discretion in denying defendant's motion for a mistrial based upon the cross-examinations of Ronald Walls and Dr. Brown. This assignment of error is overruled.

[44] In his next assignment of error, defendant argues in his brief that the trial court precluded him from arguing during closing arguments that if the jury failed to unanimously agree that the answer to Issue Three or Issue Four on the "Issues and Recommendation as to Punishment" form was "yes," the jury must answer those issues "no" and a life sentence would be imposed. The trial court responded that the jury had to unanimously recommend death or unanimously recommend life. However, although not succinctly stated, defendant's argument at trial as to this assignment of error actually appears to be that the unanimity requirement is limited only to a recommendation of death, and not life, and the trial court's alleged misunderstanding of the law on this point kept defendant "from making a potentially powerful argument to the jury."

We note that the transcript on this point is, at best, confusing. However, even if defendant's arguments at trial spoke more toward the issue of unanimity regarding Issues Three and Four rather than the final sentencing recommendation, he would, nonetheless, not be

entitled to relief. This Court recently addressed the issue of unanimity as to Issues Three and Four, as well as Issue One, in *State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995). In *McCarver*, this Court concluded that any issue which is outcome determinative of a capitally tried defendant's sentence must be answered unanimously by the jury. This Court classified Issues Three and Four as outcome determinative. *Id.* at 390, 462 S.E.2d at 39. Thus, in the present case, defendant is incorrect in his argument that when the State fails to convince all twelve jurors that the answers to Issues Three and Four are "yes," then the jury must automatically answer those issues "no." Instead, the unanimity requirement extends to both "yes" and "no" answers to Issues Three and Four.

Further, we reasoned in *McCarver* that "[a]llowing nonunanimous juries to reach final sentence recommendations of life imprisonment is in direct contradiction to our statutory requirement that 'the sentence recommendation must be agreed upon by a unanimous vote of the 12 jurors.'" *Id.* at 392, 462 S.E.2d at 41 (quoting N.C.G.S. § 15A-2000(b)). Should jurors be unable to reach the required unanimity through deliberations after a reasonable time, jurors must so report to the presiding trial judge, who, according to N.C.G.S. § 15A-2000(b), will impose a mandatory sentence of life. It remains the law that the jury is not to be informed that its failure to reach a sentencing recommendation results in mandatory imposition of life imprisonment. *See McCarver*, 341 N.C. at 394, 462 S.E.2d at 42. Accordingly, we conclude that the trial court did not err by refusing to allow defendant to argue that the unanimity requirement extends only to a recommendation of death and not life. This assignment of error is overruled.

[45] By another assignment of error, defendant contends that the trial court's instruction with respect to nonstatutory mitigating circumstances offends the Eighth and Fourteenth Amendments because it allows the jury to refuse to consider mitigating evidence. This Court has consistently rejected this claim. *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252; *State v. Green*, 336 N.C. 142, 443 S.E.2d 14.

[46] Under this assignment of error, defendant additionally argues that the trial court was bound to intervene *ex mero motu* to prevent the prosecutor from arguing that with respect to all the mitigating circumstances, both statutory and nonstatutory, jurors could consider the particular mitigator if the evidence supported it and if jurors deemed it to have mitigating value. We have reviewed the context of

the prosecutor's argument and conclude that the prosecutor was not referring to all mitigating circumstances; rather, the prosecutor was referring only to the nonstatutory mitigating circumstances. We have held before that with respect to nonstatutory mitigating circumstances, jurors' first task is to determine whether a circumstance exists factually. Should they so find, jurors next determine whether the nonstatutory circumstance should be afforded any mitigating weight. This process leaves jurors free to find a nonstatutory mitigating circumstance exists in fact, but ultimately assign the circumstance no mitigating value. *State v. Green*, 336 N.C. 142, 443 S.E.2d 14. Thus, the prosecutor's argument was proper as to nonstatutory mitigating circumstances, and the trial court had no duty to intervene *ex mero motu*. This assignment of error is overruled.

[47] By another assignment of error, defendant argues that the evidence was insufficient to support the trial court's submission of the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11), and that such error deprived defendant of his rights to a fair sentencing hearing, due process of the law and freedom from cruel and unusual punishment.

Submission of the course of conduct aggravating circumstance is proper as long as there is evidence that the victim's murder and other violent crimes were part of a pattern of intentional acts establishing that in defendant's mind, there existed a plan, scheme or design involving the murder of the victim and the other crimes of violence. *See State v. Cummings*, 332 N.C. 487, 422 S.E.2d 692 (1992). In making a determination as to whether to submit the course of conduct aggravating circumstance, the trial court considers "a number of factors, among them the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons." *State v. Price*, 326 N.C. 56, 81, 388 S.E.2d 84, 98, *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated on other grounds*, —— U.S. ——, 122 L. Ed. 2d 113, *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated on other grounds*, —— U.S. ——, 129 L. Ed. 2d 888, *on remand*, 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 224, *reh'g denied*, —— U.S. ——, 131 L. Ed. 2d 879 (1995).

The evidence in this case was sufficient to warrant the submission of the course of conduct aggravating circumstance to the jury. The evidence showed that defendant undertook a violent course of

conduct, over a narrow period of two days, in which he physically battered Alice, threatened to kill her and ultimately tried to drown her—the very day he succeeded in drowning Christopher. Indeed, as defendant held Alice's head under the water, he asked if she could see Christopher and told Alice she would join the child. This assignment of error is overruled.

## PRESERVATION ISSUE

**[48]** Defendant brings forward one assignment of error which should have been treated as a preservation issue. Defendant argues the trial court's instructions for the especially heinous, atrocious, or cruel aggravating circumstance were unconstitutionally vague. We have consistently rejected this claim, and defendant presents us with no reason upon which to reverse our earlier decisions. *State v. Rose,* 335 N.C. 301, 439 S.E.2d 518, *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 883 (1994). This assignment of error is overruled.

## PROPORTIONALITY

**[49]** Having found no error in either the guilt/innocence or sentencing phases, it is now our duty to consider whether: (1) the evidence supports the aggravating circumstances found by the jury; (2) passion, prejudice or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

The trial court submitted three aggravating circumstances to the jury: that this murder was committed while defendant was engaged in the commission of a kidnapping, N.C.G.S. § 15A-2000(e)(5); that this murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and that this murder was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person, N.C.G.S. § 15A-2000(e)(11). The jury found all three aggravating circumstances to exist. We conclude that the jury's finding of each of the aggravating circumstances was supported by the evidence. We further conclude that the jury did not sentence defendant to death while under the influence of passion, prejudice or any other arbitrary factor.

We turn now to our final statutory duty and determine whether the sentence of death in this case is excessive or disproportionate. One purpose of proportionality review "is to eliminate the possibility

that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). We compare this case to similar cases in the pool, defined in *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983) and *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542, as those that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Ultimately, whether the death penalty is determined to be disproportionate "rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47.

This Court has determined that the sentence of death was disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

However, we find the instant case is distinguishable from each of these seven cases. We note that none of the cases in which the death penalty has been held disproportionate has involved the murder of a small child. Further, multiple aggravating circumstances were found to exist in only one of the disproportionate cases. *State v. Young*, 312 N.C. 669, 325 S.E.2d 181.

This Court found it important, in determining the death penalty was disproportionate in *Young*, that the jury failed to find either the especially heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9), or the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11). *Young*, 312 N.C. at 691, 325 S.E.2d at 194. By contrast, in the present case, both the especially heinous, atrocious, or cruel and the course of conduct aggravating circumstances were found to exist by the jury.

Further, in only two of the cases where this Court has held the death penalty to be disproportionate was the especially heinous, atrocious, or cruel circumstance found by the jury. *Stokes*, 319 N.C. 1, 352 S.E.2d 653; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170. However, the present case is not similar to either *Stokes* or *Bondurant*. In the instant case, defendant grabbed a three-year-old child by a hand and a foot and hurled the child into the river. The defendant then stood on dry land, while he smiled and petted a puppy, and refused to help rescue the child. Further, evidence shows that the child would have remained conscious, underwater, for a period of approximately four minutes, during which time panic and struggle would ensue.

Finally, only one case involved the course of conduct aggravating circumstance, *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713. The instant case is distinguishable, as the jury in *Rogers* found only one aggravating circumstance—course of conduct.

In the present case, defendant was found guilty of first-degree murder based upon the theories of premeditation and deliberation and the felony murder rule. The jury found each of the three aggravating circumstances to exist. Although the trial court submitted four statutory mitigating circumstances, five nonstatutory mitigating circumstances and the catchall circumstance, no juror found any of these mitigating circumstances to exist.

We note that the death penalty has been upheld as proportionate in many cases in which the heinous, atrocious, or cruel aggravating circumstance has been found to exist by the jury. *Artis*, 325 N.C. at 341, 384 S.E.2d at 506. While this fact is certainly not dispositive, it does serve as an indication that the sentence of death in the present case is not disproportionate. We also consider it most important that this case involves the murder of a very young child. This Court weighs such a factor heavily against this adult defendant, as we have stated before that murders of small children, as well as teenagers, "particularly [shock] the conscience." *Artis*, 325 N.C. at 344, 384 S.E.2d at 508.[3] Indeed, we agree with the State that this murder exhibits a degree of depravity not commonly seen before this Court.

We feel it appropriate to compare this case, in terms of the prolonged terror and panic suffered by the victim, to those cases currently within the pool in which the victim was murdered by strangulation.

---

3. We are aware *Artis* is, at this time, no longer in the proportionality pool. However, the principle remains the same.

**STATE v. WALLS**

[342 N.C. 1 (1995)]

In *State v. Moseley*, 338 N.C. 1, 449 S.E.2d 412, we upheld the death penalty where the defendant sexually assaulted, raped, beat, stabbed and strangled the victim, a small woman, until she was dead. Testimony showed it could have taken several minutes for the victim to die from strangulation. *Id.* at 63, 449 S.E.2d at 449. The jury found the existence of six aggravating circumstances, two of which were found by the jury in the present case: that the murder was especially heinous, atrocious, or cruel, and that the murder was part of a course of conduct in which defendant engaged in the commission of crimes of violence against other persons.

In *State v. Sexton*, 336 N.C. 321, 444 S.E.2d 879, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994), the victim was strangled to death after defendant raped and sexually assaulted her. This victim would also have taken several minutes to die from strangulation. *Id.* at 373, 444 S.E.2d at 909. The jury found three aggravating circumstances to exist: that the murder was committed while defendant was engaged in the commission of a first-degree rape, first-degree sexual offense, first-degree kidnapping and common-law robbery; that the murder was especially heinous, atrocious, or cruel; and that the murder was committed for the purpose of avoiding or preventing a lawful arrest.

We conclude that this case is similar to the murders in *Moseley* and *Sexton*. The victims were vulnerable, whether by age, size or other circumstances; their injuries were either painful, or the victims endured a period of panic; and for several minutes before their deaths, the victims remained conscious and aware. Thus, based upon the characteristics of this defendant and the crime he committed, we are convinced the sentence of death was neither excessive nor disproportionate.

We conclude, therefore, that defendant received a fair trial, free from prejudicial error. Further, after comparing this case to similar cases in which the death penalty was imposed, considering both the crime and the defendant, we cannot hold, as a matter of law, that the sentence of death was disproportionate or excessive.

NO ERROR.

Justice WHICHARD concurring in the result in part.

I do not agree with the statement in the opinion for the Court that

defendant is incorrect in his argument that when the State fails to convince all twelve jurors that the answers to Issues Three and

Four are "yes," then the jury must automatically answer those issues "no." Instead, the unanimity requirement extends to both "yes" and "no" answers to Issues Three and Four.

*State v. Walls*, 342 N.C. 1, 68, 463 S.E.2d 738, 774 (1995). For the reasons stated in Justice Frye's dissenting-in-part opinion in *State v. McCarver*, the case upon which the opinion for the Court relies, I would hold the defendant's proffered argument correct. *See State v. McCarver*, 341 N.C. 364, 409-16, 462 S.E.2d 25, 51-55 (1995) (Frye, J., concurring in part and dissenting in part).

In the total context presented, however, I do not believe there is any serious possibility that the trial court's refusal to allow defendant to make the argument in question had any effect on the jury's decision. I therefore concur in the result reached on this issue in the opinion for the Court, though disagreeing with the reasoning.

Justice FRYE joins in this concurring opinion.